**Opinion issued October 17, 2013**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-10-00529-CV

————————————

**THE PETERSON GROUP, INC., PGI DEVELOPMENT GROUP, L.P., AND WELLINGTON YU, Appellants**

**V.**

**PLTQ LOTUS GROUP, L.P. AND CUBO GROUP, L.L.C., Appellees**

On Appeal from the 152nd District Court
Harris County, Texas
Trial Court Case No. 2006-36672

**O P I N I O N**

This is an appeal from a judgment after a jury trial in a case arising from two real estate transactions. Appellants Peterson Group, Inc., PGI Development, L.P., and Wellington Yu sued appellees PLTQ Lotus Group, L.P. and Cubo Group,

L.L.C. (collectively, "PLTQ") for money due under a purchase agreement and a real estate development agreement. PLTQ countersued for breach of the development agreement and fraud in connection with the real estate development project. PLTQ also argued that Peterson Group and Yu were alter egos of PGI.

The jury found for PLTQ against Peterson Group and Yu on the fraud claim. The jury also found for PLTQ against PGI on the breach of contract claim. After the verdict, the court found as a matter of law that Peterson Group and Yu were alter egos of PGI. As to the fraud cause of action, the court awarded damages found by the jury, plus pre- and post-judgment interest, in favor of PLTQ and against Peterson Group and Yu. As to the contract claim, the court awarded damages found by the jury, plus pre- and post-judgment interest and attorney's fees, in favor of PLTQ and against PGI, Peterson Group, and Yu. Thus Peterson Group and Yu were held jointly liable as alter egos for PGI's breach of contract and for the attorney's fees awarded based on that cause of action.

In the first two issues, the appellants challenge the trial court's ruling that Peterson Group and Yu were alter egos of PGI and the trial court's award of attorney's fees against Peterson Group and Yu. In their third and fourth issues, appellants argue that PLTQ's fraud claim was barred by the economic loss rule and that, in the alternative, PLTQ was required to elect a remedy between fraud and breach of contract. In their fifth issue, appellants contend that the trial court should

2

have granted their motion for judgment n.o.v. as to breach-of-contract damages for lost tenant rent because such damages were too speculative to have been awarded.

We conclude that the trial court erred by finding Peterson Group and Yu to be alter egos of PGI. We further conclude that PLTQ's fraud claim was not barred by the economic loss rule nor was PLTQ required to elect a remedy between fraud and breach of contract. Finally, we conclude that the damages awarded for lost tenant rent were not speculative.

We reverse the trial court's judgment insofar as it awarded damages for breach of contract against Peterson Group and Yu, including attorney's fees, and we affirm in all other respects.

## Background

In the spring of 2003, Dr. Loi Nguyen, a practicing cardiologist, formed PLTQ Lotus Group, L.P. for the purpose of investing in and developing real estate. Cubo Group, LLC is the general partner of PLTQ Lotus Group, and Dr. Nguyen is the president of Cubo Group. Dr. Nguyen purchased land in Houston with the intention of building a medical center where his office would be located. He purchased the land with a loan from First Bank. Jackie Nguyen, who is Dr. Nguyen's former wife and a real estate agent, introduced Dr. Nguyen to Wellington Yu. Yu is a real estate developer, primarily developing shopping

3

centers in the Houston suburbs. Yu conducts his real-estate development work primarily through his company, Peterson Group, Inc.

Yu persuaded Dr. Nguyen to purchase two additional acres adjoining the land he had purchased for the medical center and to develop the land instead as a shopping center. Yu arranged a construction loan from Metro Bank, which was used to satisfy the loan from First Bank and to fund the purchase of the additional two acres. The construction loan was also to cover the cost of developing the property into a shopping center, which they called the Royal Oaks Shopping Center. Yu formed a limited partnership, PGI Development Group, L.P., for the purpose of developing the Royal Oaks Shopping Center. Peterson I Realty GP, Inc. is the general partner of PGI. Yu is a limited partner of PGI, the president of Peterson I Realty GP, Inc., and the president of Peterson Group.

Shortly after the two additional acres were purchased for the Royal Oaks project, Yu showed Dr. Nguyen some land that he was developing as a strip center near Stonegate Commons, a residential development on the northwest side of Houston. Yu owned two acres of land there that he intended to develop, and he had a contract to purchase an additional eight acres adjacent to the land. He persuaded Dr. Nguyen to buy six of those acres, and in August 2003, Dr. Nguyen signed a purchase agreement, "the Stonegate contract." Yu and Peterson Group would later contend that Dr. Nguyen owed them $730,000 on this transaction.

By November 2003, Yu and Dr. Nguyen were proceeding with the Royal Oaks Shopping Center project. On November 13, 2003, Peterson Group and PLTQ Lotus Group entered into a development agreement for Royal Oaks. This one-page agreement established that Peterson Group, as the developer, would be responsible to: (1) negotiate the purchase of the land; (2) design and engineer the facility, including obtaining construction permits; (3) lease the shopping center; (4) construct the shopping center; (5) assist in obtaining bank financing; (6) perform accounting on the cost of the project; and (7) oversee tenant move-in and construction. PLTQ Lotus Group agreed to pay Peterson Group a developer fee of $650,000 in five installments. This contract was signed by Dr. Nguyen on a signature line that identified him as "President" of PLTQ Lotus Group and by Yu on a line that identified him as president of Peterson Group.

The next day, Yu and Dr. Nguyen signed a second development agreement for the Royal Oaks project. This contract was between PLTQ Lotus Group, identified as "the 'Client,'" and PGI, identified as "the 'Developer.'" This five-page contract provided more detail on the duties of the developer, specifically stating that the developer would submit requests to the bank to receive funds from the construction loan. This contract was executed on behalf of PLTQ Lotus Group by Dr. Nguyen, identified in the signature block as president of Cubo Group (the general partner of PLTQ Lotus Group), and on behalf of PGI by Peterson I Realty

5

GP, Inc. (the general partner of PGI). Yu signed for Peterson I Realty GP, Inc., identified as that entity's president.

Yu began developing the Royal Oaks Shopping Center. By the summer of 2004, he had become frustrated with both Dr. Nguyen's unavailability and the Royal Oaks project itself, which Yu felt was occupying too much of his time at the expense of his own development projects. In June 2004, the PLTQ-PGI development agreement was amended. The developer fee was increased to the lesser of $770,000 or 11% of the total project cost. The amendment also provided that PLTQ would add Yu as an authorized signatory for the project's account at Metro Bank, and it authorized Yu to pay reasonable and necessary development costs from the account "including, without limitation, the Development Fee." At trial, Yu testified that he did not know why that provision was in the contract, and that he never took advantage of it.

In July 2004, PLTQ entered into a contract with Atlantic Builder Company and an architect, Consolidated Architectural and Planning Service ("CAPS"), for construction of the shopping center. D. W. Tan is an architect, the president of CAPS, and the vice-president of Atlantic Builder. Tan submitted draw requests directly to Metro Bank to obtain money from Dr. Nguyen's construction loan. When he received money from the bank, he would deliver it to Yu or his representative, and Yu would give him checks for his fee and to pay the

6

subcontractors. Tan testified that it was his and Yu's practice to inflate the amount of the draw requests above the actual construction costs. According to Tan, the total amount of money withdrawn from the construction loan was approximately $900,000 in excess of actual construction costs. Tan testified that at one point, Yu asked him to prepare a false change order to submit to the bank in order to obtain an additional $400,000 in financing. Although Tan knew the change order was false, he "reluctantly" prepared it anyway. Tan had no contact with Dr. Nguyen during design and construction of the shopping center. After construction was finished, Dr. Nguyen inquired about the use of the construction loan. Tan showed him the accounting information he had and explained that he had submitted draws to the bank, within the amount of the bank loan, which exceeded the actual construction costs.

Though Dr. Nguyen would later contend that he was surprised by the accounting practices employed on this project, Yu testified that Dr. Nguyen wanted him to take the development fee from the construction loan because he felt the development fee was part of the total cost of construction. Dr. Nguyen also testified that he wanted the developer's fee included in the construction loan, but, after signing the loan paperwork, he learned that Metro Bank would not permit that. Because the bank did not want to include the developer's fee in the cost of the loan, Yu marked up the cost of construction to take the fee out of the bank loan

anyway. But Yu also solicited and received payments directly from Dr. Nguyen during the same time period.

On March 30, 2005, Yu sent Dr. Nguyen a letter on PGI letterhead informing him of a $633,965 shortfall in funds to satisfy the construction costs. In the letter, Yu reminded Dr. Nguyen of his financial obligations regarding the project, stating, "An enormous amount of time and money has been spent to date in hopes of making this project a success, and you have made commitments to prospective tenants and contractors (including PGI Development Group) under various project-related leases and other contracts." Dr. Nguyen wrote a note on the bottom of the letter agreeing to contribute an additional $600,000, in three installments: April 2005, midway through construction, and upon completion of construction.

The record also included copies of applications for payment submitted to Metro Bank on the project, and construction status reports with photographs. On June 29, 2005, Dr. Nguyen and Yu both signed a document approving an additional $400,000 in construction costs "based on Dr. Nguyen and Mr. Yu's request of changes."

By the end of 2005, the shell of the Royal Oaks Shopping Center was completed and ready for custom build-out by tenants who had been secured for the property. The tenants included restaurants, a coffee shop, and a cash-advance

8

storefront. Jackie, who had been working as the property manager, was not collecting the rent due under the leases. There were other problems. Some tenants had financial problems, including bankruptcy, and their ability to pay the rent required by the leases became questionable. Construction defects became apparent as tenants readied their spaces, but rather than seeking to have the builder repair the defects, Yu authorized the tenants to remedy the defects and charge the costs to PLTQ. To this end, Yu told Dr. Nguyen that another $1 million was required to complete the repairs and custom tenant build-outs.

In February 2006, Metro Bank sent Dr. Nguyen a letter informing him that his "project costs will . . . overrun [the] loan balance by $295,391" as of the date of the letter. The letter continued:

> This is assuming that you can control your tenants' build-out cost to finish the project.
>
> We think this is a critical situation on your project. Additional equity injection is required from you to assure the project can be continued to finish without interruption.

By this point, frustrated with delays, cost overruns, and lack of transparency as to how his money was spent, Dr. Nguyen became more involved in the project. The day he received the letter from Metro Bank about the costs exceeding his loan, Dr. Nguyen dismissed Jackie and sent Yu a letter addressed to "Peterson Group, Inc.," demanding an accounting of the project and seeking other information and

documentation. In response, Yu resigned as project developer, but he demanded payment of the remaining portion of the developer's fee.

Peterson Group and PGI sued PLTQ Lotus Group and Cubo Group (collectively, "PLTQ") for breach of the PLTQ-PGI development agreement and breach of the Stonegate contract. They sought attorney's fees under Civil Practice and Remedies Code section 38.001 for both contract claims.

PLTQ answered and pleaded several affirmative defenses. PLTQ filed a counterclaim and third-party petition against Yu and others who are not involved in this appeal. PLTQ alleged that Yu and Peterson Group were alter egos of each other. PLTQ sued Yu, Peterson Group, and PGI for fraud, specifically alleging that Yu, on his own behalf and on behalf of Peterson Group and PGI, made material misrepresentations "regarding the services he and his companies would provide in developing the Royal Oaks Center." PLTQ alleged that Yu misrepresented that he and his entities would develop the shopping center and perform the tasks enumerated in the development agreement. PLTQ further alleged that Yu made misrepresentations as work on the shopping center progressed, specifically in regard to monitoring the construction loan and using the funds only for construction of the center. PLTQ alleged that Yu "intentionally took draws against the construction loan for unauthorized expenses not related to Royal Oaks," and that he "knew and intended that PLTQ rely upon his

10

representations of honesty and trustworthiness and PLTQ did rely upon same," causing it to suffer "financial damage as a result of Yu's treachery." PLTQ also pleaded a cause of action for breach of the development agreement, saying that it set out the duties of Yu, Peterson Group, and PGI, which each failed to perform. PLTQ also sued Peterson I Realty GP, Inc., the general partner of PGI, but it later dropped this party from its pleadings. PLTQ sought a declaratory judgment that Yu, Peterson Group, and PGI were all alter egos of each other.

Throughout the litigation, PLTQ raised the issue of which person or entity— Peterson Group, Yu, or PGI—had actually done the work on the Royal Oaks project. For example, some documents showed the involvement of Peterson Group, such as a document prepared by a commercial broker and addressed to Peterson Group. Dr. Nguyen wrote checks both to "Peterson Group" and directly to Yu, including one to Yu dated April 4, 2005 for $100,000 with a notation reading, "Developmt Fee 2nd Draw." Other parties, such as Tan, believed they were working with Peterson Group. At trial, Yu explained that he was the sole employee of Peterson Group and of PGI, and because he does not wear a uniform, when he is on a worksite there is no way for others to determine if he is working for Peterson Group or for PGI. Perhaps most importantly to PLTQ, the PLTQ-PGI contract included a provision limiting the developer's liability solely to the PGI entity, yet PGI had no assets—not even a bank account. When asked about this at

trial, Yu said that he did not believe PGI needed a bank account: "[S]ince I do not sign on Dr. Nguyen's checking account, I do not touch his money, I do not touch his loan money from Metro Bank, so, only a few checks that was going to pay from Dr. Nguyen to myself for a development fee."

Dr. Nguyen testified about his damages. He disagreed with Yu's method of calculating the developer's fee based on the amendment providing that he earn 11% of the project cost. Dr. Nguyen disagreed that items such as interest on the loan should be included in the cost that formed the basis for Yu's 11% fee because doing so created an incentive for delay. Likewise Dr. Nguyen thought that including excessive tenant build-out costs, which were approved by Yu, created a disincentive for managing costs because high tenant build-out costs would increase the developer's fee. However, Dr. Nguyen conceded that at the time he entered into the PLTQ-PGI contract and its amendment, he understood that the developer's fee would be based on project costs including tenant build-out costs.

Dr. Nguyen testified that he was not seeking a total refund of the developer's fee. He testified that Yu accomplished some of the project's goals, and he indicated that he was satisfied with some of the tenants that Yu secured for the project. However, Dr. Nguyen testified that he was seeking a reimbursement of the "extra" money Yu charged. Dr. Nguyen said, "Whatever he didn't earn he should return to me." Dr. Nguyen testified that he was seeking the following other

12

elements of damages in addition to the excessive developer's fee: (1) lost rent money; (2) lost tenant build-out money; (3) additional cash that he was required to provide either to satisfy bank loan requirements or project obligations; (4) the cost of employing a new contractor to repair construction defects; (5) commissions for leases on businesses that never opened or that closed shortly after opening; and (6) payment of a lien on behalf of an anticipated tenant that filed for bankruptcy. He also testified that he borrowed against his life insurance and withdrew money from his retirement account to pay for project expenses, but he was unable to quantify a value of money lost by taking those actions.

The jury found that PLTQ failed to comply with the Stonegate real estate contract, but that its failure to comply was excused because "a different performance was accepted as full satisfaction of performance of the original obligations of the agreement" and because compliance was waived by Peterson Group. Thus, the jury did not award Peterson Group damages on its breach of contract claim.

The jury found that Yu and Peterson Group committed fraud against PLTQ, attributing 5% of the fraud to Yu and 95% of the fraud to Peterson Group. The jury was instructed to consider only one element of damages as to fraud, which was: "Money used without PLTQ's knowledge or consent and not for PLTQ's

13

direct or indirect benefit." The jury awarded PLTQ Lotus Group $184,000 for fraud.

The jury also found that PGI failed to comply with the Royal Oaks development agreement. The question for contract damages was granulated. The jury awarded PLTQ the following sums as damages for PGI's breach of contract: (1) $158,000 for "[m]oney paid to tenants for build-outs in excess of what was agreed to under their leases or otherwise agreed to by PLTQ"; (2) $53,000 for "[m]oney PLTQ paid to tenant subcontractors as a result of workman liens or threatened liens"; (3) $48,000 for "[t]he reasonable and necessary cost to repair [construction] work . . . at the Royal Oaks Shopping Center"; and (4) $136,021 for "[l]oss of tenant rent in the past that it would have received had the agreement been performed." The jury awarded no damages on the following elements of damages: (1) "[b]roker fees paid by PLTQ in excess of fees that would have been paid had the agreement been performed"; (2) loan interest paid by PLTQ Lotus Group in excess of interest that would have been paid had the agreement been performed; (3) loss of tenant rent in the future that it would receive had the agreement been performed; and (4) money withdrawn from the Royal Oaks construction loan that PLTQ would not have had to pay had the agreement been performed.

After the verdict, the court ruled as a matter of law that Peterson Group and Yu were alter egos of PGI. The court rendered judgment on the verdict as to the

14

fraud cause of action in favor of PLTQ and against Peterson Group and Yu. As to the breach of contract claim, the court rendered judgment on the verdict in favor of PLTQ and against PGI, Peterson Group, and Yu. Peterson Group, Yu, and PGI appealed.

## Analysis

### I. Alter ego

In their first issue, the appellants argue that the trial court erred by ruling that Peterson Group and Yu were liable for breach of the development agreement because they were alter egos of PGI. No alter-ego question was presented to the jury. Instead, the trial court granted a directed verdict that PGI was the alter ego of both Peterson Group and Yu. It made no alter-ego findings involving PGI's general partner, Peterson I Realty GP, Inc.

Appellants argue that the alter-ego ruling was in error because the alter-ego theory of veil-piercing simply does not apply to limited partnerships. Indeed, Texas courts have uniformly declined to apply the alter-ego theory to pierce a limited partnership's "veil" to impose the entity's liabilities on a limited partner.[1]

---

[1] *See Seidler v. Morgan*, 277 S.W.3d 549, 558 n.5 (Tex. App.—Texarkana 2009, pet. denied); *Asshauer v. Wells Fargo Foothill*, 263 S.W.3d 468, 474 (Tex. App.—Dallas 2008, pet. denied); *Pinebrook Props., Ltd. v. Brookhaven Lake Prop. Owners Ass'n*, 77 S.W.3d 487, 499–500 (Tex. App.—Texarkana 2002, pet. denied); *Joiner v. Coast Paper & Supply*, No. 13-07-00623-CV, 2008 WL 2895851, at *6 n.10 (Tex. App.—Corpus Christi July 29, 2008, no pet.) (mem. op.); *McDaniel v. Houtz*, No. 06-05-

15

The need for any equitable veil-piercing doctrine is fundamentally dubious as applied to the liabilities of a limited partnership. Unlike a person doing business with a corporation, a person doing business with a limited partnership always has recourse against any general partner in the same manner as partners are liable for the liabilities of a partnership without limited partners. TEX. BUS. ORGS. CODE § 153.152(b) (West 2012).[2] The identities of the general partners of a limited

---

00077-CV, 2006 WL 3626325, at *1 (Tex. App.—Texarkana Dec. 14, 2006, no pet.) (mem. op.); *see also Prospect Energy Corp. v. Dallas Gas Partners, LP*, 761 F. Supp. 2d 579, 602 n.23 (S.D. Tex. 2011); *Waller v. DB3 Holdings, Inc.*, No. 3:07-CV-0491-D, 2008 WL 373155, at *10 (N.D. Tex. Feb. 12, 2008).

The only case we have found that suggests a contrary conclusion under Texas law is *Experian Information Solutions, Inc., v. Lexington Allen L.P.*, in which a federal magistrate judge was "not persuaded . . . that alter ego liability does not apply to limited partnerships." No. 4:10-CV-144, 2011 WL 1627115, at *9 (E.D. Tex. Apr. 7, 2011). The federal district court accepted the magistrate judge's recommendation to deny summary judgment in the case, although the actual reasoning of the magistrate judge did not depend upon a finding that veil-piercing principles apply to limited partnerships. *Experian Info. Solutions, Inc. v. Lexington Allen L.P.*, No. 4:10-CV-144, 2011 WL 1637935, at *1 (E.D. Tex. Apr. 28, 2011) (adopting findings and conclusions of the magistrate judge). Instead, the magistrate judge's recommendation was premised on the Texas limited partnership statute, which provides that a limited partner who participates in control of the partnership's business may be liable to third parties who transact business with the limited partnership in the belief that the limited partner is a general partner. *Experian Info. Solutions*, 2011 WL 1627115, at *9.

[2]   *See generally* Elizabeth S. Miller, *Are There Limits on Limited Liability? Owner Liability Protection and Piercing the Veil of Texas Business Entities*, 43 TEX. J. BUS. L. 405, 430 (2009) ("There is little case law dealing with veil

partnership are readily ascertainable because they must be periodically reported to the secretary of state. *Id*. § 153.302(a)(1)(E).

In contrast to general partners, limited partners in a limited partnership are generally not responsible for the limited partnership's obligations unless they take some action to accept or subject themselves to such liability.[3] Indeed, the statute expressly provides that a limited partner "is not liable for the obligations of a limited partnership unless" one of two circumstances applies: (1) the limited partner is also a general partner; or (2) in addition to the exercise of the limited partner's rights and powers as a limited partner, the limited partner participates in the control of the business. *Id.* § 153.102(a); *see also id*. § 153.003(c) ("A limited partner shall not have any obligation or duty of a general partner solely by reason of being a limited partner."). The plain implication of the statute is that a limited partner may become liable for the obligations of the limited partnership due to the limited partner's participation in the "control of the business," though that liability

piercing of limited partnerships, presumably because there is always at least one general partner who has personal liability for the debts and obligations of the partnership . . . .").

[3] This principle is not limited by the decision in *Delaney v. Fidelity Lease Ltd.*, 526 S.W.2d 543 (Tex. 1975), noted in the dissent, which predates the adoption of Chapter 153 in 2003, as well as the modern jurisprudence of the Supreme Court of Texas concerning equitable veil-piercing. *See generally Isaminger v. Gibbs*, No. 05-99-00978-CV, 2000 WL 898867, at *4 (Tex. App.—Dallas July 7, 2000, pet. denied) (mem. op., not designated for publication) (explaining subsequent legislative history eradicating the *Delaney* holding).

17

is limited by statute to "a person who transacts business with the limited partnership reasonably believing, based on the limited partner's conduct, that the limited partner is a general partner." *Id.* § 153.102(b). Unlike the few courts in foreign jurisdictions which have characterized the liability that can be imposed in such circumstances as an equitable exercise of limited-partnership veil-piercing,[4] our view is that this liability is better characterized as an application of ordinary partnership principles, or, in other words, a limitation on the protection generally available to limited partners.

Significantly, the limited partnership statute also contains an extensive list of actions which do not constitute participation in "control of the business" for purposes of third-party liability pursuant to section 153.102. As relevant to this appeal, such actions include acting as (A) a contractor for or an officer or other agent or employee of the limited partnership; (B) a contractor for or an agent or employee of a general partner; or (C) an officer, director, or stockholder of a corporate general partner. *Id.* § 153.103(1).

In defense of the trial court's alter-ego finding, PLTQ does not rely on any of these statutory provisions to establish that Peterson Group or Yu are liable for the obligations of the PGI limited partnership, either as general or limited partners.

---

[4]     *See Canter v. Lakewood of Voorhees*, 22 A.3d 68, 70 (N.J. Super. Ct. App. Div. 2011); *In re Adelphia Commc'ns Corp.*, 376 B.R. 87, 93–94 (Bankr. S.D.N.Y. 2007).

Instead, PLTQ relies exclusively on common-law principles supporting the alter-ego veil-piercing doctrine, as supposedly applied in *Speedemissions, Inc. v. Capital C. Enterprises, Ltd.*, No. 01-07-00400-CV, 2008 WL 4006748 (Tex. App.—Houston [1st Dist.] Aug. 28, 2008, no pet.) (mem. op.), and *Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd.*, 237 S.W.3d 379 (Tex. App.—Houston [14th Dist.] 2007, no pet.), for its contention that the alter-ego theory may be applied to a limited partnership. We find both cases to be inapplicable. In *Speedemissions*, a vehicle-inspection business alleged that its former employee tortiously interfered with its business relationships and misappropriated confidential information. *Speedemissions*, 2008 WL 4006748, at *1. In response to a no-evidence motion for summary judgment, Speedemissions argued that Capital C Enterprises was the alter ego of its former employee. *Id.* at *8 & n.6. Although the opinion set forth the black-letter law pertaining to the alter-ego theory and piercing the corporate veil, the case was decided on a different basis, that there were no "triable issues of fact" to support the argument that Capital C Enterprises was the alter ego of the former Speedemissions employee. *Id.* at *9. Similarly, in *Solutioneers Consulting*, the Fourteenth Court of Appeals recited the black-letter law on piercing the corporate veil, and then concluded that there was no evidence to support the jury's verdict that Solutioneers Consulting was the alter ego of its owner. *Solutioneers Consulting*, 237 S.W.3d at 387–88. Thus, neither

19

case actually applied the alter-ego theory or any other veil-piercing theory to subject a limited partner to the liability of a limited partnership.

The significance of the trial court's alter-ego finding in this case is that it is the basis for holding Peterson Group and Yu liable for PGI's breach of the development agreement. But that agreement expressly limited the developer's liability to the "assets" of the PGI entity. Moreover, the undisputed fact is that PLTQ Lotus Group's sole contractual counterparty to that agreement was PGI itself, expressly identified in the agreement's signature block as a limited partnership. The agreement was executed on behalf of PGI by Peterson I Realty GP, Inc., identified as PGI's general partner, and it was signed on behalf of that entity by Yu, identified as Peterson I Realty GP's president.

PLTQ alleged in its pleadings that Peterson Group and Yu were alter egos of PGI, a limited partnership. Although PLTQ initially sued PGI's general partner, it later nonsuited the general partner and chose to proceed solely against Peterson Group, Yu, and PGI. At oral argument, counsel for PLTQ explained that because the general partner is liable for the debts of the partnership, a judgment against PGI would be sufficient to impose liability on Peterson I Realty GP, Inc. However, the relief sought by PLTQ is not the imposition of liability on Peterson I Realty GP, Inc.; it is, instead, seeking to impose liability on Peterson Group and Yu for the obligations of PGI.

The veil-piercing doctrine as applied to corporate alter egos has never been indiscriminately applied to impute liability to arguably responsible bystanders—it is applied to the owners and operators of the firm, including "shareholders, officers, and directors" who otherwise would ordinarily be insulated from liability for corporate obligations. *See, e.g.*, *Castleberry v. Branscum*, 721 S.W.2d 270, 271 (Tex. 1986). Or in other words, when the "fiction" of the corporate or other entity form is disregarded—when its "veil" is "pierced"—there must be some objective basis for identifying those persons or other entities who in reality were responsible for the actions of and the liabilities created by the disregarded entity. To the extent the equitable doctrine could be applied to a limited partnership, it likewise would only apply to impute liability to analogous constituents of the limited partnership, such as the limited partners and managers responsible for controlling the business.[5] Moreover, the application of the doctrine would be limited to circumstances in which the limited partnership was used to perpetrate actual fraud for the direct, personal benefit of the defendant. *Cf. Shook v. Walden*, 368 S.W.3d 604, 621 (Tex. App.—Austin 2012, pet. denied) ("claimants seeking

---

[5] Of course to the extent a limited partnership's general partner is itself a corporation or other liability-limiting entity—just as PGI's general partner was a corporation—then that entity itself may be subject to veil-piercing. PLTQ did not seek that remedy in this case. It nonsuited its claims against the general partner, and it proceeded solely on an equitable theory that Peterson and Yu could be held liable as alter egos of PGI.

21

to pierce the veil of an LLC must meet the same requirements as they would if the entity were a corporation").[6]

Here, there are only two identifiable parties behind the "veil" of PGI's limited partnership structure–its general partner (Peterson I Realty GP, Inc.) and its sole limited partner (Yu). PLTQ abandoned its pleading which sought to pierce the corporate veil of Peterson I Realty GP, Inc., and it never litigated the question of whether Peterson Group and Yu were alter egos of the general partner. Nor did PLTQ plead or prove that Peterson Group was a limited partner of PGI, such that it could be held liable for PGI's obligations, either pursuant to section 153.102 of the Business Organizations Code or by equitable veil-piercing. Finally, PLTQ has not asserted in the trial court or on appeal that Yu, as limited partner, can be held liable for the limited partnership's liabilities pursuant to section 153.102, and in particular there has been no allegation or proof that PLTQ reasonably believed that

---

[6]   Contrary to the dissent's suggestion, application of the veil-piercing doctrine in this case also should not hinge on the unsupported speculation that PGI failed to comply with some regulatory formality. Adherence to corporate formalities has been de-emphasized by most Texas courts conducting a veil-piercing analysis ever since the legislative admonition that liabilities for corporate obligations not be imposed on corporate stakeholders based upon "the failure of the corporation to observe any corporate formality." TEX. BUS. ORGS. CODE § 21.223(a)(3) (West 2012); *see, e.g.*, *Howell v. Hilton Hotels Corp.*, 84 S.W.3d 708, 714 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) ("Under Business Corporation Act article 2.21, observance of corporate formalities is no longer a factor that can be considered in determining alter ego.").

Yu was a general partner of PGI.[7] To impose a limited partnership's liability on its limited partner in this case under the guise of the equitable veil-piercing doctrine would eviscerate the statutory framework governing the limitation of liability for limited partnerships as expressed in section 153.102(b), and thus we decline to apply it in this case. *Cf. Shook*, 368 S.W.3d at 621 (emphasizing the importance of deferring to legislative standards governing veil piercing of corporations).[8]

We conclude that the trial court erred by finding that Peterson Group and Yu are the alter egos of PGI. We sustain the first issue, and we hold that Peterson Group and Yu are not liable for PGI's breach of the development contract.

---

[7] *See* TEX. BUS. ORGS. CODE § 153.102(b) ("If the limited partner participates in the control of the business, the limited partner is liable only to a person who transacts business with the limited partnership reasonably believing, based on the limited partner's conduct, that the limited partner is a general partner."). Although our dissenting colleague would hold Yu liable under section 153.102(b) purely "[b]ecause of the control he exercised over the activities of PGI," apparently without regard for the substantial scope of activities covered by the safe harbor of section 153.103, it is nevertheless plain that mere control is not sufficient—a claimant must also demonstrate a reasonable belief, based on the limited partner's own conduct, that the limited partner is a general partner.

[8] Even the bankruptcy court in *Adelphia*, which recognized a theoretical possibility of equitable veil-piercing of limited partnerships under Delaware law, warned that "veil piercing and other equitable remedies cannot be utilized as an 'end run' around the proof required in Section 17–303 [the Delaware counterpart to TEX. BUS. ORGS. CODE §§ 153.102–.103] to permit a third party to prevail on a lesser showing." *In re Adelphia Commc'ns*, 376 B.R. at 108.

## II. Attorney's fees

At trial, the parties stipulated to lump-sum attorney's fees, which were not segregated by cause of action, and the trial court awarded PLTQ the stipulated amount of attorney's fees. In their second issue, the appellants contend that the trial court erred by ruling that Peterson Group and Yu were responsible for attorney's fees. Specifically, the appellants argue that Peterson Group and Yu cannot be held liable as alter egos of PGI for attorney's fees awarded on PLTQ's cause of action for breach of the development agreement. Among other things, they argue that PLTQ is not entitled to recover contractual attorney's fees when it pleaded only for statutory attorney's fees.

First, having held that Peterson Group and Yu are not alter egos of PGI, we conclude that they cannot be held liable for the attorney's fees awarded on PLTQ's cause of action for breach of the PLTQ-PGI Royal Oaks development agreement.

Nevertheless, PLTQ contends that it is entitled to recover attorney's fees from Peterson Group both because of a trial stipulation and under the Stonegate contract. This contract included a provision for awarding attorney's fees in a suit to enforce or interpret the contract:

> 11.15. Attorney's Fees. If any action at law or in equity becomes necessary to enforce or interpret any term, provision or condition of this Contract, the prevailing party shall be entitled to recover the reasonable attorney's fees, costs, and necessary disbursements (including, but not limited to, expert witness fees and

24

deposition costs) incurred or made by it in addition to any other relief to which it may become entitled.

PLTQ argues that all of appellants' arguments are really about failure to segregate. We disagree. Peterson Group and Yu have advanced alternative arguments, including the failure to segregate and the argument that they are not liable for attorney's fees at all.

"As a general rule, litigants in Texas are responsible for their own attorney's fees and expenses in litigation." *Ashford Partners, Ltd. v. ECO Res., Inc.*, 435 S.W.3d 35, 41 (Tex. 2012). Under Texas law, a court may award attorney's fees only when authorized by statute or by the parties' contract. *MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 669 (Tex. 2009). Whether a party is entitled to seek an award of attorney's fees is a question of law that we review de novo. *Holland v. Wal–Mart Stores, Inc.*, 1 S.W.3d 91, 94 (Tex. 1999).

The Civil Practice and Remedies Code provides that "[a] person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract." TEX. CIV. PRAC. & REM. CODE. ANN. § 38.001 (West Supp. 2012). To obtain an award of attorney's fees under Section 38.001, "a party must (1) prevail on a cause of action for which attorney's fees are recoverable, and (2) recover damages." *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997).

However, "[p]arties are free to contract for a fee-recovery standard either looser or stricter than Chapter 38's." *Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 653 (Tex. 2009). When parties include such a provision in a contract, the language of the contract controls, rather than the language of the statute. *Id.* at 654–56 (reviewing definition of "prevailing party" under contract to determine whether plaintiff who had not recovered any actual damages was entitled to recover attorney's fees). Thus, a party who successfully defends a breach of contract claim but does not recover damages might be entitled to attorney's fees under a contractual provision even though he would not be entitled to attorney's fees under Chapter 38. *See Robbins v. Capozzi*, 100 S.W.3d 18, 22–23, 27 (Tex. App.—Tyler 2002, no pet.); *Weng Enters., Inc. v. Embassy World Travel, Inc.*, 837 S.W.2d 217, 222–23 (Tex. App.—Houston [1st Dist.] 1992, no writ); *Silver Lion, Inc. v. Dolphin St., Inc.*, No. 01–07–00370–CV, 2010 WL 2025749, at *18 (Tex. App.—Houston [1st Dist.] May 20, 2010, pet. denied) (mem. op.); *see also Epps v. Fowler*, 351 S.W.3d 862, 868–69 (Tex. 2011) (holding that defendant is prevailing party for purposes of award of attorney's fees when plaintiff nonsuits case with prejudice). In light of this difference in application of statutory and contractual attorney's fees, and because a court's judgment must conform to the pleadings, *see* TEX. R. CIV. P. 301, a party who pleads for attorney's fees only under Chapter 38 waives its claim for attorney's

26

fees under a contractual provision. *See Intercontinental Grp. P'ship*, 295 S.W.3d at 659.

In its live pleading at trial, PLTQ pleaded for reasonable attorney's fees under Chapter 38 of the Texas Civil Practice and Remedies Code. It did not plead for attorney's fees under the "prevailing party" provision of the Stonegate contract. PLTQ first raised this theory in a post-trial motion to amend its pleadings. Appellants opposed this motion on the grounds that it would cause them prejudice because PLTQ had consistently denied the existence of that contract. In response, PLTQ argued that it was sufficient that it had pleaded for attorney's fees based on frivolity and harassment, as opposed to the contractual provision. However, the appellate record does not include any amended PLTQ pleading actually alleging entitlement to recovery of attorney's fees under the Stonegate contract. Moreover, although the jury found in favor of PLTQ on its affirmative defense, because PLTQ did not recover damages related to the Stonegate contract, it is not entitled to attorney's fees under Chapter 38 on the basis of its favorable jury finding on the Stonegate contract. *See Green Int'l*, 951 S.W.2d at 390. We hold that the judgment awarding attorney's fees against Peterson Group and Yu cannot be supported on the basis of the contractual attorney's fees provision in the Stonegate contract. *See* TEX. R. CIV. P. 301 (stating that judgment must conform to the pleadings); *Intercontinental Grp. P'ship*, 295 S.W.3d at 659 (holding that party

27

waived its right to recover attorney's fees under a contractual provision by pleading for attorney's fees only under Chapter 38); *see also Stoner v. Thompson*, 578 S.W.2d 679, 682–84 (Tex. 1979) (holding that party may not be granted relief in the absence of pleadings to support that relief).

Finally, the parties' trial stipulation as to the amount, reasonableness, and necessity was an agreement as to what amount of attorney's fees the court would award to the prevailing party. It was not a basis for an award of attorney's fees. *See Ashford Partners*, 401 S.W.3d at 41.

We sustain this issue, and hold that the trial court erred by rendering judgment that awarded PLTQ its attorney's fees against Peterson Group and Yu.

## III. Economic loss rule

In their third issue appellants argue that PLTQ's fraud claim was barred by the economic loss rule because it arose from a breach of duties established by the contract between PGI and PLTQ Lotus Group. Appellants thus contend that the trial court erred by denying their motions for directed verdict and judgment notwithstanding the verdict on the fraud claim.

A trial court may disregard a jury's findings and grant a motion for judgment n.o.v. only when a directed verdict would have been proper. *See* TEX. R. CIV. P. 301; *Fort Bend Cnty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex. 1991); *see also Prudential Ins. Co. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex.

28

2000). Judgment n.o.v. should be granted when a legal principle precludes recovery. *See B & W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 15 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

"Although the Texas Supreme Court described the term as 'something of a misnomer,' one general formulation of the economic loss rule, as applicable to this case, is that a party may not recover in tort for purely economic losses suffered to the subject matter of a contract." *James J. Flanagan Shipping Corp. v. Del Monte Fresh Produce N.A., Inc.*, 403 S.W.3d 360, 365 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (quoting *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 415, 418 (Tex. 2011)). To determine whether the economic loss rule applies, we consider "both the source of the defendant's duty to act (whether it arose solely out of the contract or from some common-law duty) and the nature of the remedy sought by the plaintiff." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 45 (Tex. 1998) (quoting *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 12 (Tex. 1996)). We look to the substance of the cause of action, not the manner in which it was pleaded, to determine the type of action that is brought. *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 617–18 (Tex. 1986). "The nature of the injury most often determines which duty or duties are breached. When the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone." *Id.* at 618.

Under some circumstances, however, a party's actions may breach duties simultaneously in contract and in tort. *See id.* To maintain a separate tort cause of action, the plaintiff must show that he has "suffered an injury that is distinct, separate, and independent from the economic losses recoverable under a breach of contract claim." *Sterling Chems., Inc. v. Texaco Inc.*, 259 S.W.3d 793, 797 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (citing *D.S.A. Inc. v. Hillsboro Indep. Sch. Dist.*, 973 S.W.2d 662, 663–64 (Tex. 1998)). Therefore, while the economic loss rule has been applied to bar negligence and products liability causes of action when the injury alleged was also the subject matter of a contract, *see Sharyland Water Supply*, 354 S.W.3d at 417–18, it has not been extended to bar recovery for fraud or fraudulent inducement. *See id.* at 418; *Formosa Plastics*, 960 S.W.2d at 46; *see also Flanagan Shipping*, 403 S.W.3d at 365; *Matlock Place Apartments, L.P. v. Druce*, 369 S.W.3d 355, 378 (Tex. App.—Fort Worth 2012, pet. denied) (holding that economic loss rule did not bar recovery for statutory fraud).

Here, PLTQ's fraud claim is based on material misrepresentations made by PGI, Peterson Group, and Yu. While the development agreement enumerated the various tasks that Yu and his entities would perform in furtherance of developing Royal Oaks, PLTQ's fraud claim was not based on a failure to accomplish these tasks or negligence in carrying them out. Rather, PLTQ's fraud claim was based on the separate harm it suffered as a result of Yu's misrepresentations and acts of

30

dishonesty which did not further the goal of developing the Royal Oaks Shopping Center. For example, PLTQ contends that "Peterson covertly spearheaded the theft of the funds" by encouraging Atlantic Builders and Tan to submit false bank draws on PLTQ's loan account. These funds were not all expended on Royal Oaks, such that PLTQ would obtain a benefit as contemplated by the development agreement. To the contrary, the evidence showed that Yu orchestrated withdrawals from the construction loan which were then directed away from the Royal Oaks project, including $124,442.63 diverted to Yu's development at Stonegate and $60,000 paid to Peterson for undocumented expenses related to phantom tenants. In the fraud damages question, the jury was asked to quantify the amount of money "used without PLTQ's knowledge or consent and not for PLTQ's direct or indirect benefit," and in response to this question the jury found damages in the amount of $184,000.[9]

The jury agreed with PLTQ and found that Peterson and Yu committed fraud. Peterson and Yu argue that their actions amount only to a breach of the parties' agreement and are not fraudulent. For its breach of contract claim, PLTQ

---

[9] Any construction loan funds spent on Royal Oaks would have been used for the benefit of PLTQ, so contrary to the dissent's reasoning, this jury finding is perfectly consistent with the separate finding that no contract damages—defined as damages "that resulted from PGI Development's failure to comply with the Royal Oaks Development Agreement"—resulted from "[m]oney withdrawn from the Royal Oaks construction loan that PLTQ would not have had to pay had the agreement been performed."

sought to recover sums of money paid toward the development of the Royal Oaks Shopping Center that it would not have had to pay if the agreement had been performed, such as excess tenant build-out costs, money paid to tenant subcontractors to satisfy workman liens or avoid the imposition of liens, and the reasonable and necessary costs to repair work performed by Atlantic. In addition PLTQ sought recovery of lost rent that it alleges it would have collected had the agreement been performed. These are consequential damages arising from PGI's failure to perform as it was obligated under the development agreement.

However the duty not to commit fraud is different from and independent of the duty to comply with the terms of a contract. *See Formosa Plastics Corp.*, 960 S.W.2d at 47–48. And as to its claim for fraud, PLTQ sought to recover for a category of damages that was distinctly different from the contract damages: "[m]oney used without [its] knowledge or consent and not for [its] direct or indirect benefit." The nature of the fraud injury is money that PLTQ lost as a result of Yu's deceitful actions, not simply economic loss related to the shopping center itself, i.e., the subject matter of the contract. *See Flanagan Shipping*, 403 S.W.3d at 365. Thus, the alleged fraud injury did not arise from the contract, and the economic loss rule does not apply. *See id.*; *Formosa Plastics*, 960 S.W.2d at 47; *see also Sharyland Water Supply*, 354 S.W.3d at 418 (noting economic losses

are recoverable for breach of fiduciary duty). Therefore, the trial court did not err in denying appellants' motion for judgment n.o.v. We overrule the third issue.

## IV. Election of remedies

In their fourth issue, appellants argue that if PLTQ's fraud claim is not barred by the economic loss rule, then PLTQ should have been required to elect a remedy as between the tort and fraud damages awarded by the jury.

A party is entitled to sue and seek damages on alternative theories, but it is not entitled to a double recovery. *Waite Hill Servs., Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184 (Tex. 1998); *Madison v. Williamson*, 241 S.W.3d 145, 158 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). "If a plaintiff pleads alternate theories of liability, a judgment awarding damages on each alternate theory may be upheld if the theories depend on separate and distinct injuries and if separate and distinct damages findings are made as to each theory." *Madison*, 241 S.W.3d at 158; *see Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361, 367 (Tex. 1987). "Under the one-satisfaction rule, [however,] a plaintiff is entitled to only one recovery for any damages suffered because of a particular injury." *Utts v. Short*, 81 S.W.3d 822, 831 (Tex. 2002); *accord Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 303 (Tex. 2006); *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex. 2000); *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex. 1991); *Madison*, 241 S.W.3d at 158. The principle

applies when "the trial court elects the remedy which affords an injured plaintiff the most favorable relief against a single defendant when multiple theories of liability cause an indivisible injury." *Madison*, 241 S.W.3d at 158–59; *compare Utts*, 81 S.W.3d at 831, *and Sterling*, 822 S.W.2d at 5, *with Birchfield*, 747 S.W.2d at 367, *and Chapa*, 212 S.W.3d at 303.

We have already explained not only that PLTQ's fraud claim was viable but also that it was different from and sought recovery of different damages from PLTQ's claim for breach of contract. Because the jury awarded PLTQ separate and distinct damages for separate and distinct injuries for fraud and breach of contract, no election of remedies is required, and the jury's verdict awarding damages for both may be upheld. *See Madison*, 241 S.W.3d at 158; *Birchfield*, 747 S.W.2d at 367. We overrule this issue.

## V. Lost tenant rent

In their fifth issue, appellants argue that the trial court erred by not granting their motion for j.n.o.v. as to $136,021 of the jury's award of contract damages because lost tenant rent was too speculative. The appellants do not argue that lost rents were not available as damages for breach of the development agreement, and for purposes of this issue we assume that they were. Instead, in their motion for j.n.o.v., they argued that lost tenant rent was an inappropriately speculative measure of damages because Royal Oaks was a new enterprise and had no

34

established track record. Appellants thus contend that there was no evidence from which the lost profits could be estimated.

To recover damages for breach of contract, a plaintiff must show that he suffered a pecuniary loss as a result of the breach. *S. Elec. Servs., Inc. v. City of Houston*, 355 S.W.3d 319, 323–24 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). To recover lost profit damages, a plaintiff must show the loss by competent evidence and with reasonable certainty. *See ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 876 (Tex. 2010); *Tex. Instruments, Inc. v. Teletron Energy Mgmt, Inc.*, 877 S.W.2d 276, 279 (Tex. 1994). "Such losses must be the natural, probable, and foreseeable consequence of the defendant's conduct." *S. Elec. Servs.*, 355 S.W.3d at 324. A plaintiff may not recover breach-of-contract damages "if those damages are remote, contingent, speculative, or conjectural." *Id.* at 323–24. "Thus, the absence of a causal connection between the alleged breach and the damages sought will preclude recovery." *Id.* at 324.

Both parties have briefed this issue in the trial court and in this court as one pertaining to the recovery of lost profits. "Lost profits are damages for the loss of net income to a business and, broadly speaking, reflect income from lost business activity, less expenses that would have been attributable to that activity." *Bowen v. Robinson*, 227 S.W.3d 86, 96 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) (citing *Miga v. Jensen*, 96 S.W.3d 207, 213 (Tex. 2002)). The complaint on appeal

is that the damages awarded were speculative, and the settled case law pertaining to the award of lost profits is instructive.

"What constitutes reasonably certain evidence of lost profits is a fact intensive determination." *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992). "As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained." *Id.* Lost profits cannot be based on pure speculation or wishful thinking. *Tex. Instruments*, 877 S.W.2d at 279. The Supreme Court of Texas has stated:

> Profits which are largely speculative, as from an activity dependent on uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into unknown or unviable markets, or on the success of a new and unproven enterprise, cannot be recovered. Factors like these and others which make a business venture risky in prospect preclude recovery of lost profits in retrospect. . . . The mere hope for success of an untried enterprise, even when that hope is realistic, is not enough for recovery of lost profits.

*Id.* at 279–80.

However, the fact that a business is new does not absolutely preclude recovery of lost profits. *See id.* at 280; *Hernandez v. Sovereign Cherokee Nation Tejas*, 343 S.W.3d 162, 174 (Tex. App.—Dallas 2011, pet. denied). Rather, "[w]hen there are firmer reasons to expect a business to yield a profit, the enterprise is not prohibited from recovering merely because it is new." *Tex.*

36

*Instruments*, 877 S.W.2d at 280. Thus, in the case of an untested business seeking lost-profits damages, the inquiry should focus on the experience of the people involved in the enterprise, the nature of the business activity, and the relevant market. *Id.*

Under the development agreement, the developer was required to oversee leasing of the project. PLTQ contended that the tenants that Yu found for the shopping center were unable to meet their obligations and Yu's failure to find tenants who were able to pay the rent was a breach of contract. Dr. Nguyen secured replacement tenants, and the old and new leases were introduced into evidence at trial without objection.

PLTQ sought lost tenant rents based on the difference between the rents in the leases secured by Yu and Peterson Group and those for the replacement tenants. There is no suggestion that the replacement leases were unprofitable or that they resulted in increased expenses, so the difference in the rent between the original leases and the replacement leases corresponds to lost profit.

Although PLTQ was new to the real estate business, Yu and Peterson Group were not. Contrary to the appellants' arguments, the jury had the actual leases from the tenants that Yu secured as a basis from which it could assess lost tenant rent damages. In this case, the party responsible for overseeing the leases had experience in the relevant market, which was not an untested business. Rather, it

37

was the leasing of commercial real estate in a strip mall. The relevant market included restaurants and businesses providing goods and services. Notably, the introduction of the leases themselves provided evidence from which the jury could estimate lost tenant rents without speculation. Accordingly, we conclude that the lost tenant rents were not too speculative to be awarded, and we hold that the trial court did not err in denying the motion for judgment n.o.v. on this ground. We overrule this issue.

## Conclusion

Solely with respect to Peterson Group and Yu, we reverse the judgment as to breach of the development agreement, including attorney's fees. In all other respects we affirm. We remand this case to the trial court for calculation of pre- and post-judgment interest and for further proceedings in accordance with this opinion.

Michael Massengale
Justice

Panel consists of Justices Keyes, Higley, and Massengale.

Justice Keyes, dissenting.