

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-14-00254-CV
_____

UMC PHYSICIAN NETWORK SERVICES, APPELLANT

V.

EDWARD LEINS, APPELLEE

On Appeal from the 72nd District Court
Lubbock County, Texas
Trial Court No. 2012-504,360; Honorable Ruben G. Reyes, Presiding

May 2, 2016

## MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

Appellant, University Medical Center Physician Network Services (PNS), appeals from a judgment entered in favor of Appellee, Edward Leins, following a jury trial, in a lawsuit alleging multiple causes of action. PNS asserts (1) the evidence is legally and factually insufficient to support the jury's finding that PNS and Leins agreed that PNS would follow its physician grievance policies and procedures when disciplining Leins, (2) the two written agreements at issue cannot be properly construed to create a contract

between Leins and PNS to follow PNS's grievance policies and procedures, (3) the evidence is legally insufficient to support the jury's damages award, (4) the evidence is legally and factually insufficient to support the jury's award of attorney's fees, and (5) the trial court's judgment awarding attorney's fees to Leins for proceedings before the Supreme Court is not supported by the verdict of the jury. We affirm in part, reverse and render in part, and reverse and remand in part.

BACKGROUND

In May 2013, Leins filed his *First Amended Petition* alleging PNS and its Chief Executive Officer, Paul Acreman, violated the Texas Whistleblower Act, breached their contract with him, defamed and libeled him, tortiously interfered with his contractual relations, and breached a fiduciary duty owed to him.[1] Following a verdict in Leins's favor as to the breach of contract cause of action, the trial court issued its judgment awarding him $109,000 in damages,[2] reasonable attorney's fees through trial of $69,000, together with an additional $25,000 in attorney's fees through appeal to this court, and $50,000 in fees for representation before the Supreme Court.[3]

There are two agreements at issue here: (1) an *Agreement for Physician Staffing Services* (herein the *Physician Staffing Agreement*) between PNS and Texas Tech University Health Sciences Center (TTUHSC), wherein TTUHSC agreed to provide physicians for clinics under PNS's management and control, and (2) a *Physician*

---

[1] Paul Acreman was originally named as an additional defendant; however, he was subsequently dismissed.

[2] The verdict of the jury awarded Leins $9,000 for "[l]ost income, benefits, and other expenses sustained in the past" and $100,000 for "[l]ost income, benefits, and other expenses that, in reasonable probability, will be sustained in the future."

[3] The trial court's judgment reduced the jury's verdict for attorney's fees through an appeal to the Supreme Court from $275,000 down to $50,000.

*Employment Agreement* between Leins and TTUHSC, wherein Leins agreed to engage in full-time duties as a medical practitioner in PNS's medical offices, on behalf of TTUHSC, in satisfaction of TTUHSC's duties under the *Physician Staffing Agreement*.

In July 2002, the *Physician Staffing Agreement* was executed by TTUHSC's Executive Vice President and PNS's Chief Executive Officer. TTUHSC and PNS "enter[ed] into a written agreement for the terms of each physician placement, and the agreement *shall be an attachment* to this Agreement." (Emphasis added). The attachment would document "the identity of the TTUHSC physician, location of the medical-office, expected hours of service, compensation to TTUHSC, and *any other terms agreed upon by the parties.*" (Emphasis added). The *Physician Staffing Agreement* also stated "[t]he Agreement *and any Attachments* contain the entire agreement and understanding between the parties concerning the subject matter of this Agreement. *The terms of the Agreement shall apply to each Attachment. If there is a conflict between the terms of the Agreement and any Attachment, the terms of the Attachment shall prevail.*" (Emphasis added). Under the terms of the *Physician Staffing Agreement*, TTUHSC would select physicians "in consultation with, and final approval of, PNS." PNS was also responsible to pay the cost of using any recruiting firms and any cost associated with moving a physician to Lubbock.

The *Physician Staffing Agreement* described such physicians as "employees or independent contractors of TTUHSC and not agents or employees of [University Medical Center] or PNS." However, PNS was responsible for "supervis[ing], operat[ing], and manag[ing]" each medical clinic. PNS was also tasked with "establish[ing] and implement[ing] the medical office's operating policies and standards of operation,

3

services, maintenance, pricing, and other policies affecting the medical office." The *Agreement* encouraged the participation of physicians in the development of policies and standards for each office. PNS and TTUHSC also agreed to designate compliance officers to enforce the policies, procedures, and regulations of each party.

The *Agreement* authorized PNS to remove a physician "for cause," and upon written notice to TTUHSC, PNS was empowered to remove a physician for "repeated failure to perform the duties required by the [*Physician Staffing Agreement*] *or the physician's failure or refusal to comply with PNS's policies, standards and regulations*." (Emphasis added). It further provided that "[e]ither party may remove a physician from a medical office without cause, *subject to the terms of each Attachment."* Under the terms of the agreement, PNS was responsible to pay TTUHSC an agreed-upon annual base compensation for physician salaries, benefits, professional liability insurance, continuing medical education, and administrative costs. In turn, TTUHSC was solely responsible for paying the agreed-upon salaries of the assigned physicians.

In January 2010, Leins and TTUHSC executed an agreement whereby Leins agreed to engage as a medical practitioner at the Urgent Care Center at Kingspark in Lubbock, Texas, "*pursuant to the* [*Physician Staffing Agreement*]." (Emphasis added.) Under a subsection of the *Physician Employment Agreement* entitled "PNS Staffing," the parties agreed that the *Physician Employment Agreement* was "made *in conjunction* with the [*Physician Staffing Agreement*] under which [Leins was] assigned to a PNS Clinic . . . . " (Emphasis added). The agreement further acknowledged that Leins's services would be "managed by" PNS. The *Physician Employment Agreement* commenced on August 1, 2010, and ended July 31, 2011, with the provision that the

4

agreement would renew automatically each August 1st on a year-to-year basis unless terminated in accordance with the terms of that agreement.  Paragraph 10.1.2 of that agreement provided that it could be "terminated <u>without cause</u> upon 90 days written notice" to Leins.

Under the *Physician Employment Agreement*, Leins agreed to assist TTUHSC and PNS in quality improvement activities and  to actively participate and cooperate with the marketing staff of TTUHSC and PNS.  Leins acknowledged "that continuation of [his] Agreement [was] contingent upon continued funding as provided by [PNS] to TTUHSC under separate document."  Although Leins's base compensation was to be paid by TTUHSC, PNS agreed to pay that base compensation to TTUHSC.  PNS also agreed to pay two-thirds of certain professional fees to TTUHSC, who would then reapportion the fees and pay Leins his share for his professional fees.

Under the *Physician Employment Agreement*, Leins agreed to comply with all TTUHSC rules, regulations, policies, and applicable law.  Furthermore, the parties agreed the *Physician Employment Agreement* "contain[ed] the sole and entire agreement between the Parties and supersede[d] any and all other agreements between the p/Parties [sic]."  The agreement provided for notices to be sent to TTUHSC, Leins, and PNS.  The *Physician Employment Agreement* further stated that it applied only to physicians employed through TTUHSC and assigned to PNS facilities "*pursuant to the Master Staffing Agreement, between TTUHSC and PNS.*"  (Emphasis added).

In conjunction with the execution of the *Physician Staffing Agreement*, an "ATTACHMENT TO AGREEMENT FOR PHYSICIAN SERVICES, Edward J. Leins,

5

D.O." was also executed by TTUHSC's Executive Vice President and PNS's Chief Executive Officer. The document was described as "an attachment to an Agreement between [PNS] and [TTUHSC], dated January 1, 2000, entitled 'Agreement for Physician Staffing Services,' TTUHSC Contract number ALMW 00151." In the TTUHSC Routing Sheet circulating the Attachment, TTUHSC described the "[c]ontract [t]ype" as "[r]evenue," and struck the term "Other." The contract description was described as "Attachment to Physician Staffing Agreement 00151-Edward J. Leins. D.O." A second amendment to the *Physician Staffing Agreement* was subsequently issued as an "Attachment" setting additional compensation and benefits for Leins.

PNS's Code of Conduct and Ethical Behavior describes itself as a "system to respond to allegations of improper/illegal activities and the enforcement of appropriate disciplinary action against employees who have violated compliance policies." The Code of Conduct was available to all staff members via a notebook in each clinic. It provided, "[a]ny PNS employee who shows evidence that he or she is not willing to comply with [the] Compliance Plan will be terminated," and "[*I*]*f an area of non-compliance is identified, we will follow the procedures set forth in the Compliance Plan* to identify the source of the problem and take corrective action." (Emphasis added). The Code also contained a form to be executed by employees stating the employee "must comply with the standards in the Code of Conduct and Ethical Behavior and the Compliance Plan or face disciplinary action, will cooperate fully with the Compliance Committee and Compliance Office," and report any unethical or illegal activities to the Compliance Office.

The purpose of the section entitled "Physician Grievance Procedures" was to "formulate procedures to apply in cases of proposed corrective action against a physician or termination of a physician's employment."[4] Under Paragraph A. entitled "Termination Without Cause," the policy stated unless the *physician's contract with PNS* specifically provided otherwise, a physician could be terminated without cause, without any grievance procedure, or other type of due process. Under Paragraph B. 2. a., entitled "Corrective Action," the procedure stated that "[w]henever the activities or professional conduct of a physician appears to be lower than accepted standards of the medical profession; *contrary to* [PNS] *bylaws, policies or procedures: contrary to the physician's written contract with* [PNS]; . . . any person may request corrective action." (Emphasis added). PNS's procedures for handling a corrective action require PNS's Chief Executive Officer to follow detailed procedures before a corrective action could issue by its Board of Directors.

At trial, Leins testified that during his employment, his boss was Paul Acreman, PNS's Chief Executive Officer. According to his testimony, all the terms of the written employment agreement between him and TTUHSC were negotiated with Acreman in PNS's offices. In his tenure, he never met with any TTUHSC representatives. According to Leins's testimony, PNS managed his practice, collected his billings, paid his expenses, took a portion of its management fee from his collections and sent the remainder of his earned income to TTUHSC, who would then issue a paycheck to him. At PNS's urging, as a part of his employment arrangement, Leins executed a document agreeing to be bound by PNS's policies and procedures. He had no dealings with

_____

[4] The Grievance Procedures were formally approved by Vernon Farthing, M.D., Chair of the Board of Directors and Acreman.

TTUHSC—no duties, no teaching responsibilities, no TTUHSC patients—and did not negotiate benefits or contract terms with TTUHSC, he merely received his paycheck from them.

Leins testified that PNS's Code of Conduct and Ethical Behavior contained a well-defined process for handling corrective actions or reprimanding a physician. He also testified he was employed by TTUHSC and the University Medical Center, PNS's parent organization, and although he did not have a written contract with PNS, he believed he had a contractual agreement with PNS, embodied in the *Physician Staffing Agreement* and the *Physician Employment Agreement*. He worked under the two agreements, and when suit was necessary, he sued the people he actually worked for rather than TTUHSC.

In a March 5, 2012 meeting with Acreman, Glenn Frick (PNS's Chief Operating Officer) and Brett King (PNS's Office Manager), Leins reported an incident had occurred eight months earlier involving another doctor. After some discussion, the PNS officials immediately suspended the other doctor pursuant to PNS's Code of Conduct and Ethical Behavior. On April 9, Leins received a letter from Acreman indicating PNS had concluded that he too had violated the Code of Conduct and Ethical Behavior by failing to immediately report the violation. The letter suspended Leins without pay from April 10, 2012, until April 16, 2012, and required Leins to complete HIPAA[5] compliance training provided by PNS and "at your personal expense, complete a live CME ethics course of at least six (6) hours on the topic of professionalism, compliance, anti-

_____

[5] Health Insurance Portability and Accountability Act (HIPAA), Pub. L. No. 104-191, 110 Stat. 1936 (1996).

kickback, and/or fraud and abuse."[6]   Leins timely met all the conditions of his suspension; however, he lost wages in the sum of $13,000 and he incurred expenses for the continuing medical education course.

On April 16, TTUHSC sent Leins a letter of reprimand stating "[t]his letter also constitutes notice that your current contract is being terminated as of August 31, 2012."[7] Leins later received another letter from TTUHSC, dated May 2, 2012, indicating TTUHSC had not been notified of his temporary suspension without pay by PNS until after its deadline for issuing checks; therefore, the deduction for the period of suspension would be reflected in his June 1st payroll check.

Leins testified that, in violation of PNS's grievance policies, PNS failed to give him written notification that he was under investigation, failed to give him written notice of his right to appear and appeal, and failed to appoint a committee of three physicians to hear the dispute. In defense to the allegations made, Leins countered that he reported the incident in a timely fashion under PNS policies and procedures and was unaware at the time of the incident that the doctor was actually engaging in misconduct. Leins also asserted PNS violated its policies by retaliating against him for reporting the other physician's behavior.[8]

---

[6] Neither party disputes whether Lein's punishment was subject to the Physician Grievance Procedures contained in PNS's Code of Conduct and Ethical Behavior.

[7] Acreman testified Leins was not terminated due to any misconduct but was instead terminated because of a restructuring of the PNS/TTUHSC business model.

[8] During the same period of time, a complaint was lodged against Leins with the Texas Medical Board. The Board conducted its investigation and concluded there was insufficient evidence to prove Leins had violated the Texas Medical Practice Act.

Acreman testified PNS was part of University Medical Center which provided a broad base of primary care physicians to support the TTUHSC medical school and hospital. Although Leins was a TTUHSC employee managed by PNS, all physician contract negotiations and paperwork were done through PNS. He was assigned to PNS and performed his contractual duties under the management of PNS according to the PNS/TTUHSC business model. As such, Leins was required to comply with the rules, regulations, and policies of both TTUHSC and PNS as part of his employment, including PNS's Code of Conduct and Ethical Behavior.[9]

According to Acreman's testimony, Leins was suspended per a corrective action under PNS's "Physician Grievance Procedure." He admitted the process was initiated without a written complaint against Leins. He also admitted PNS did not comply with its Physician Grievance Procedures by (1) failing to inform Leins he was the subject of a peer review proceeding prior to his suspension and punishment, (2) failing to inform the chair of the board of directors of the request for a corrective action involving Leins, (3) failing to appoint a three-physician review committee,[10] (4) notifying Leins of the conclusion of the corrective action without giving him notice that he had thirty days to request a hearing before an independent hearing officer, (5) denying Leins the opportunity to go before the committee and state his case, have an attorney present, call or cross-examine witnesses, hear any of the evidence, and give a written statement or closing argument, and (6) failing to notify him of his right to an appeal. He testified

---

[9] PNS's Code of Conduct and Ethical Behavior stated that an employee would "not suffer any penalty or retaliation for good faith reporting of any suspected misconduct or violation. If an employee reported suspected misconduct in good faith, he would not "get suspended, or docked or fired, nothing [would] happen to them."

[10] The committee also contained a compliance officer as its fourth member.

that, in hindsight, it would have been a good idea to have "implemented [the PNS Grievance Procedures] to the letter of the law" because "[a] lot would have been avoided." In an apparent attempt to explain why the required procedures were not followed, he also testified "[i]t's his policy, he can change it if he wants."

Matthew Spencer testified he was PNS's Compliance Director and oversaw every employee within the PNS umbrella. He testified PNS would have been better off to have followed its Physician Grievance Procedures but indicated PNS and its management did not have to specifically follow its procedures. Shortly after Leins's complaint about the other doctor's behavior was brought to Spencer's attention, he met with PNS and TTUHSC compliance departments to discuss the matter.

Glenn Frick testified he was PNS's Chief Operating Officer whose responsibilities included day-to-day operations of Leins's clinical responsibilities. In his position, he handled most of the contracts with physicians. He agreed Leins had a duty to report what he observed in June 2012 but failed to do so in a timely manner. Other than this instance, he testified Leins never violated PNS's policies or procedures.

Leins's attorney, Grady Terrill, testified he practiced law in the community for thirty-seven years in the general area of litigation. He was Chair of the District's Grievance Committee for the State Bar of Texas and was familiar with the factors used to determine the reasonableness of attorney's fees, i.e., time it would take to handle a matter of this type, its complexity, and the novelty of the issues presented. He testified he billed his time at $250 an hour and that his law firm had expended well over 300 hours on Leins's case. Terrill opined that the sum of $67,184 was a reasonable and necessary fee for services rendered to Leins in this case. He further testified that an

11

additional sum of $25,000 would be appropriate if the case were appealed to an intermediate court of appeals, and that an additional $25,000-$50,000 would be appropriate if the case were appealed to the Texas Supreme Court. PNS's attorney did not object to any portion of Terrill's testimony.

The trial court charged the jury with the following questions, in pertinent part, and the jury gave the following responses:

QUESTION 1

Did Leins and PNS agree that PNS would follow PNS's policies and procedures as stated in [PNS's Physician Grievance Procedures] when disciplining Leins?

In deciding whether parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

Answer: <u>Yes</u>

QUESTION 2

Did PNS fail to follow the policies and procedures in [PNS's Physician Grievance Procedures]?

Answer: <u>Yes</u>

QUESTION 3

What sum of money, if any, if paid now in cash, would fairly and reasonable compensate Leins for his damages, if any, that resulted from such failure to comply?
Answer separately in dollars and cents for damages, in any.

1. Lost income, benefits and other expenses sustained in the past.

Answer: $9,000.00

2. Lost income, benefits, and other expenses that, in reasonable probability, will be sustained in the future.

Answer: $100,000.00

The jury found against Leins on his defamation and tortious interference causes of action; however, it awarded him reasonable attorney's fees of $69,000 through trial, $25,000 through the Court of Appeals, and $275,000 through all Supreme Court proceedings.[11] The trial court's judgment reflected the jury's verdict with the exception that the trial court reduced the $275,000 in fees through the Supreme Court to $50,000. This appeal followed.

ISSUES ONE AND TWO

By its first issue, PNS asserts the evidence is legally and factually insufficient to support a finding PNS had any contractual responsibility to follow its grievance procedures because (1) Leins did not have a contract with PNS, (2) the *Physician Employment Agreement* was not attached to the *Physician Staffing Agreement* when it was executed in 2002, (3) the *Physician Employment Agreement* does not reference PNS's Physician Grievance Policies and Procedures, and (4) there is no evidence of an oral agreement or that Leins was a third-party beneficiary to the *Physician Staffing Agreement*. By its second issue, PNS contends the *Physician Employment Agreement* and the *Physician Staffing Agreement* cannot be read together to create a contract between Leins and PNS. We disagree.

---

[11] The jury's verdict awarded $50,000 for attorney's fees through the petition for review stage at the Texas Supreme Court, together with an additional $75,000 through the merits briefing stage, and an additional $150,000 through oral arguments and the completion of proceedings stage.

13

(A) STANDARD OF REVIEW

In reviewing a legal sufficiency issue, we may sustain the challenge only when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence, or (d) the evidence conclusively establishes the opposite of the vital fact in question. *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex. 2003), *cert. denied, 541 U.S. 1030,* 124 S. Ct. 2097, 158 L. Ed. 2d 711 (2004). In determining whether there is legally sufficient evidence to support the finding under review, a reviewing court must view the evidence in a light most favorable to the judgment, indulging every reasonable inference favorable to the finding if a reasonable factfinder could and disregarding evidence contrary to the finding unless a reasonable factfinder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). In conducting our review, we must remain mindful of the fact that the factfinder is the sole judge of the credibility of a witness and the weight to be given the testimony. *Id.* at 819. The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *Id.* at 827.

An assertion that the evidence is factually insufficient to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex. 1965). In reviewing an appellant's factual sufficiency challenge, we consider, examine, and weigh all of the evidence in the record, both in support of and contrary to the finding. *See Dow Chemical Co. v.*

14

*Francis,* 46 S.W.3d 237, 242 (Tex. 2001). *See also Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406-07 (Tex. 1998), *cert. denied,* 525 U.S. 1017, 119 S. Ct. 541, 142 L. Ed. 2d 450 (1998). In doing so, we may not substitute our judgment for that of the trier of fact or pass upon the credibility of the witnesses. *Ellis,* 971 S.W.2d at 406-07. Our duty is not to retry the case but to set aside the jury's finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust*. Id.* at 407; *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986). When both legal and factual sufficiency challenges are raised on appeal, a reviewing court must first examine the legal sufficiency of the evidence. *See Glover v. Tex. Gen. Indemnity Co.,* 619 S.W.2d 400, 401 (Tex. 1981).

### (B) CONTRACT INTERPRETATION

When construing a contract, the primary goal is to determine the parties' intent as expressed in the terms of the contract*. Chrysler Ins. Co. v. Greenspoint Dodge of Houston, Inc.,* 297 S.W.3d 248, 252 (Tex. 2009). "Under generally accepted principles of contract interpretation, all writings that pertain to the same transaction will be considered together, even if they were executed at different times and do not expressly refer to one another." *DeWitt Cnty. Elec. Coop., Inc. v. Parks,* 1 S.W.3d 96, 102 (Tex. 1999). *See Brent v. Field* 275 S.W.3d 611, 617 (Tex. App.—Amarillo 2008, no pet.) (citing *Fort Worth Indep. Sch. Dist. v. City of Fort Worth,* 22 S.W.3d 831, 840 (Tex. 2000) ("Instruments pertaining to the same transaction may be read together to ascertain the intent of the parties, even if the parties executed the instruments at different times."). Furthermore, it is uniformly held that other documents, even unsigned documents, may be incorporated by reference into the document signed by the person sought to be charged. *Owen v. Hendricks,* 433 S.W.2d 164, 167 (Tex. 1968); *The City*

15

*of Port Isabel v. Shiba*, 976 S.W.2d 856, 858 (Tex. App., —Corpus Christi 1998, no pet.). *See Gray & Co. Realtors, Inc. v. Atlantic Housing Foundation, Inc.*, 228 S.W.3d 431 (Tex. App.—Dallas 2007, no pet.) (terms of real estate contract between seller and purchaser incorporated by reference into broker representation agreement between broker and purchaser).

The language used to refer to the incorporated document is not important as long as the signed document "plainly refers" to the incorporated document. *Owen*, 433 S.W.2d at 167; *In re C & H News Co.*, 133 S.W.3d 642, 645 (Tex. App.—Corpus Christi 2003, orig. proceeding). The language in the signed document must show the parties intended for the other document to become part of the agreement. *Bob Montgomery Chevrolet, Inc. v. Dent Zone Companies*, 409 S.W.3d 181, 189 (Tex. App.—Dallas 2013, no pet.). Documents incorporated into a contract by reference become a part of that contract, *In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010) (original proceeding) (*per curiam*) (citing *In re Bank One, N.A.*, 216 S.W.3d 825, 826 (Tex. 2007) (original proceeding)); *Teal Constr. Co./Hillside Villas Ltd. v. Darren Casey Interests, Inc.*, 46 S.W.3d 417, 420 (Tex. App.—Austin 2001, pet. denied), and both instruments must be read and construed together. *In re C & H News*, 133 S.W.3d at 645-46.

Most lawsuits involving an employer's alleged non-compliance with policies and procedures deal with wrongful termination suits where the plaintiff is contending that a company handbook or manual modified the employment-at-will rule. In these cases, which are somewhat analogous to the case before us, the courts have held that in order for the at-will relationship to be modified, the handbook or manual must modify the employer's rights "in a meaningful and special way." *Vida v. Il Paso Employee's Credit*

16

*Union,* 885 S.W.2d 177, 177 (Tex. App.—El Paso 1994, no writ) (employer's rights so limited where manual states "no employee shall be penalized for using the grievance procedure").

### (C) DISCUSSION

Here, Leins asserts he and PNS agreed to follow PNS's policies and procedures when disciplining him. Viewing the record as a whole, we cannot say that, as a matter of law, the trial court erred by submitting QUESTION ONE to the jury. *See John Wood Group USA, Inc. v. ICO, Inc.,* 26 S.W.3d 12, 16 (Tex. App.—Houston [1st Dist.] 2000, pet. denied). Neither can we say that the jury's finding in QUESTION ONE is so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. *Cain*, 709 S.W.2d at 176.

First, there was sufficient evidence from which the jury could have found that Leins had such an agreement with PNS. The *Physician Staffing Agreement* plainly states that the parties entered into a written agreement for physician placement and the *Physician Employment Agreement* would be attached thereto. Importantly, the *Physician Staffing Agreement* states the entire agreement was comprised of the agreement itself and "any Attachments," which would include any *Physician Employment Agreement.* The *Physician Staffing Agreement* also states that its terms would apply to each Attachment and "[i]f there [were] a conflict between the terms of the Agreement and any Attachment, the terms of the Attachment [would] prevail." Ergo, both PNS and TTUHSC anticipated that the terms of the two agreements would be read together, and if so, the terms of the *Physician Employment Agreement* would control in the event of a conflict. *See Castroville Airport, Inc. v. City of Castroville,* 974 S.W.2d

17

207, 211-12 (Tex. App.—San Antonio 1998, no pet.) (attachments referred to in contract incorporated by reference even where parties disputed whether attachments were actually attached); *MTrust Corp., N.A. v. LJH Corp.,* 837 S.W.2d 250, 253 (Tex. App.—Fort Worth 1992, writ denied) (attachment to contract incorporated by reference). This is not suprising since the two documents are inextricably intertwined, i.e., one agreement could not exist and further any useful purpose of the PNS/TTUHSC business model without the existence of the other agreement.

Secondly, although the *Physician Staffing Agreement* stated that "[a]ll physicians providing services at the medical office are employees or independent contractors of TTUHSC," there was sufficient evidence for the jury to find that the relationship between PNS and Leins was that of employer-employee. In addition to the language of the two agreements and PNS's Physician Grievance Procedures, PNS was tasked with supervising, operating, and managing each medical office and the physicians assigned to each office. PNS was also empowered not only to establish and implement the medical offices' operating policies, standards of operating, "and other policies affecting the medical offices"[12] but to discipline or terminate any physician for noncompliance. In addition, Leins perceived Acreman as his boss and took directions from PNS. He never met with TTUHSC representatives and all terms of his contracts were negotiated between him and Acreman in PNS's offices. Leins had no duties or teaching responsibilities at TTUHSC and did not see any TTUHSC patients. TTUHSC was, in

---

[12] Those terms not defined in a contract are given their "generally accepted or commonly understood meaning." *Gilbert Texas Constr., L.P. v. Underwriters at Lloyd's London,* 327 S.W.3d 118, 127 (Tex. 2010). "Establish" means "to make firm or state" and "implement" means "to carry out, accomplish, fulfill . . . to give practical effect to and ensure of actual fulfillment through concrete measures." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 778, 1134 (4th ed. 1976).

essence, merely a conduit, netting revenues from PNS before issuing a paycheck to Leins.

The *Physician Employment Agreement* between Leins and TTUHSC was "made in conjunction[13] with the [*Physician Staffing Agreement*] under which Leins was assigned to a PNS Clinic and . . . acknowledge[d] [his] services [would] be managed by [PNS] which would bill and collect for [his] services and be compensated for its practice costs." Notices were required to be sent to TTUHSC, PNS, and Leins. In conjunction with the *Physician Employment Agreement*, its attachment to the *Physician Staffing Agreement* was approved by TTUHSC's Executive Vice President and PNS's Chief Executive Officer.[14] A subsequent amendment to the *Physician Employment Agreement* was also issued as an attachment to the *Physician Staffing Agreement*.

That there was an agreement between Leins and PNS that PNS would follow its Physician Grievance Procedures when disciplining him is also supported by PNS's Code of Conduct and Ethical Behavior and its handling of the corrective action against Leins. As in the *Physician Staffing Agreement*, the Physician Grievance Procedures provide that a PNS employee could be terminated if he or she was not willing to comply with PNS's compliance plan. PNS's Physician Grievance Procedures also provide that PNS *will follow* the procedure in taking corrective actions and requires PNS to follow each step of the process as indicated by its language that PNS "will" and/or "shall"

---

[13] "[I]n conjunction with" means in "union, association, [and/or] combination with." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 480.

[14] The document was described as "an attachment to an Agreement between [PNS] and [TTUHSC], dated January 1, 2000, entitled 'Agreement for Physician Staffing Services,' TTUHSC Contract number ALM W 00151." To "attach" is to "make fast or join." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 140.

perform each step. Moreover, PNS relied on its Physician Grievance Procedures in handling Leins's corrective action and Leins complied with the punishment meted out. Although Acreman testified he could unilaterally alter the Physician Grievance Procedures at any time, the jury was entitled to infer that he could not because those procedures were signed by Acreman and the chair of PNS's board of directors, indicating more was needed than his unilateral action. Furthermore, there is no language in the Physician Grievance Procedures granting Acreman such power. Moreover, the jury could have made a credibility determination not to believe Acreman's or Spencer's testimony that Acreman had such power.

Having considered the entire record in light of the jury charge,[15] we cannot say the jury's finding that PNS and Leins agreed PNS would follow its physician grievance policies and procedures when disciplining Leins was so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain,* 709 S.W.2d at 176. Accordingly, we find there was both legally and factually sufficient evidence to support the finding that PNS breached its contractual obligation to follow its Physician Grievance Procedures when it punished Leins. Accordingly, issues one and two are overruled.

ISSUE THREE

By its third issue, PNS asserts Leins's evidence in support of damages is also legally and factually insufficient. Specifically, PNS contends there were no damages because no contract was breached, and assuming a contract was breached, Leins's failed to establish his actual and future damages. Because we have determined there

---

[15] We measure sufficiency of the evidence against the jury question submitted. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000).

20

was sufficient evidence for a jury to find PNS breached its agreement with Leins, we will limit our discussion to whether Leins failed to establish his actual and future damages.

Leins offered proof that he suffered $13,000 in actual damages due to PNS's failure to follow its Physician Grievance Procedures in the form of lost wages and actual expenses incurred due to the suspension and accompanying punishment. In support of its position, PNS contends Leins failed to establish that the result of the grievance proceedings would have been different had PNS followed its policies and procedures. Having established PNS agreed to follow those procedures and then breached its agreement, Leins was not required to make an additional showing that the result of the grievance proceedings would have been different if the procedures had been followed. Instead, Leins's remedy for PNS's breach is to put him in *status quo ante,* that is, to put him back in the position he occupied prior to the punishment. In this case, the evidence, as measured by the applicable jury instructions, established that Leins was entitled to $9,000 in actual damages for actual wages lost and expenses incurred.

That said, we also find Leins failed to establish causation between PNS's breach and any future damages. To recover damages for breach of contract, a plaintiff must show that in reasonable probability he has suffered or will suffer a pecuniary loss as a result of the breach. *Peterson Group, Inc. v. PLTQ Lotus Group, L.P.*, 417 S.W.3d 46, 64 (Tex. App.—Houston 2013, pet. denied). To recover a future loss, a plaintiff must show the loss by competent evidence and with reasonable certainty. *Id.* A plaintiff may not recover damages for breach of contract, past or future, if those damages are remote, contingent, speculative, or conjectural. *Id.* (citing *S. Elec. Servs., Inc. v. City of Houston*, 355 S.W.3d 319, 323-24 (Tex. App.—Houston [1st Dist.] 2011, pet. denied).

21

The lost wages and cost of required courses due to Leins's suspension were for specific damages incurred during a finite period of time, and they were a direct result of the corrective action PNS took in violation of its contractual obligations. After he was released from his week-long suspension, Leins returned to work with no additional course requirements. Thus, Leins failed to offer sufficient proof of any additional damages he might have suffered as a result of the breach of contract by PNS. Accordingly, issue three is overruled as to the jury's award of $9,000 for past actual damages, but sustained as to any future damages.

ISSUES FOUR AND FIVE

By its fourth and fifth issues, PNS contests the trial court's award of attorney's fees. Issue four generally asserts the evidence is legally and factually insufficient to support an attorney's fee award; whereas, issue five asserts the award of attorney's fees for proceedings in the Texas Supreme Court is not supported by the jury's verdict. PNS specifically contends (1) the evidence supporting the award of attorney's fees fails to adequately address the reasonableness factors set forth in *Arthur Andersen & Co. v. Perry Equipment Corp.*, 945 S.W.2d 812 (Tex. 1997), (2) the evidence presented varies from the questions submitted to the jury, and (3) the judgment is not supported by the jury findings regarding the recovery of fees for proceedings before the Texas Supreme Court.

At trial, the attorney for Leins proffered testimony that $250 an hour was a "reasonable and customary fee for this type of litigation." He further stated that he was familiar with and had applied the "*Arthur Andersen* factors" in determining that his hourly rate was reasonable. He also testified that his law firm had expended "well over 300

22

hours in this matter" and that the "total fees through [the date of trial were] $63,520 . . . [together with] expenses of $3,664." Based on those facts, he opined that "the amount of $67,184 [was] a reasonable fee to be charged in this case . . . ." While the attorney did testify that other attorneys and staff had worked on the case, he further stated that "[w]e have not duplicated our billing." No details of services rendered were given and no documentary evidence was offered. As to a reasonable fee for services rendered on appeal, the attorney merely stated "a reasonable fee [for an intermediate appeal] would be at a very minimum $25,000," and "if the matter goes to the Supreme Court—would be a very bare minimum $25,000 and upwards to $50,000 before the Supreme Court." At no time did the attorney offer specific testimony concerning that *Arthur Andersen* factors or their application to the facts of this particular case, nor did he offer any evidence detailing the hours expended on each phase of the litigation. Furthermore, he did not segregate the services rendered as to the various causes of action being pursued.[16] During trial, no objections were made as to the testimony given concerning attorney's fees and the cross-examination consisted of a few brief questions pertaining to whether there were any billing records to be presented and whether the hours listed were separated according to the various causes of action. The only objection lodged by PNS at the time of submission of the issue concerning attorney's fees was that "there is no evidence in the record which would properly support a finding of such issue."

Leins contends PNS waived the issues being asserted by failing to properly preserve error. *See* TEX. R. APP. P. 33.1 (requiring, as a prerequisite to the presentation of an appellate issue, a showing of "a timely request, objection, or motion" concerning

---

[16] We note that attorney's fees were recoverable as to some, but not all, causes of action being asserted by Leins.

23

the issue being raised). Leins further contends PNS failed to properly assign error by failing to proffer authoritative arguments and authority. *See* TEX. R. APP. P. 38.1(i) (requiring clear and concise argument for the contentions made, with appropriate citations to authorities and to the record). Having reviewed the record and the briefs, we conclude that the only issue raised by PNS that presents anything for review in this case is the issue pertaining to the legal and factual sufficiency of the evidence.[17] Accordingly, we overrule issue five.

As to the remaining issue, issue four, we note that for more than a century, Texas law has not allowed the recovery of attorney's fees unless an award is authorized by statute or contract. *Tony Gullo Motors, L.P. v. Chapa*, 212 S.W.3d 299, 310-11 (Tex. 2006); *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 119 (Tex. 2009). That said, the Texas Civil Practice and Remedies Code provides that where a claim is based upon an oral or written contract, "reasonable attorney's fees" may be awarded in addition to the amount of the claim being asserted. TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (West 2015). In order to recover attorney's fees under this section, a litigant must (1) prevail on a breach of contract cause of action and (2) recover damages. *MBM Financial v. Woodlands Operating Co.*, 292 S.W.3d 660, 666 (Tex. 2009). The Texas Supreme Court has stated that "[i]f attorney's fees are proper under section 38.001(8), the trial court has no discretion to deny them" provided, however, the party seeking to recover attorney's fees still bears the burden of proving the amount and reasonableness of those fees. *Smith v. Patrick W.Y. Tam Trust*, 296 S.W.3d 545, 547 (Tex. 2009). Therefore, in this case, because

---

[17] We examine the legal and factual sufficiency of the evidence pertaining to attorney's fees under the same standards discussed above.

Leins did prevail on his contract cause of action, and he is entitled to recover damages as discussed above, he is also entitled to recover his attorney's fees to the extent they were supported by the evidence presented.

The reasonableness of an award of attorney's fees is ordinarily a matter left to the sound discretion of the factfinder, and a reviewing court may not substitute its judgment for that of the jury. *Barker v. Eckman*, 213 S.W.3d 306, 314 (Tex. 2006). In *Arthur Andersen*, drawing from Rule 1.04 of the Texas Disciplinary Rules of Professional Conduct,[18] the Supreme Court identified a non-exclusive list of factors to be considered in determining a reasonableness of a fee. *See Arthur Andersen*, 945 S.W.2d at 818. Those factors include the following: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood that the acceptance of representation in the case at issue will preclude other employment by the attorney; (3) the fee customarily charged in the locality for similar legal services; (4) the amount in controversy and the result obtained; (5) the time limitations imposed by the client or the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

Fourteen years after *Arthur Andersen*, the Texas Supreme Court issued its opinion in *El Apple I, Ltd. v. Olivas*, where it held that a request for attorney's fees under the Lodestar method (a method of calculation of attorney's fees where the number of

---

[18] TEX. DISCIPLINARY R. PROF. CONDUCT 1.04, *reprinted in* TEX. GOV'T CODE, tit. 2, subtit. G app. (STATE BAR RULES, art. X, § 9).

hours worked is multiplied by the prevailing hourly rate) must be supported by sufficient details of the work performed in order for the court to make a meaningful review of the reasonableness of a fee request. *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 761 (Tex. 2011) (holding that "a party applying for an award of attorney's fees under the [L]odestar method bears the burden of documenting the hours expended on the litigation and the value of those hours"). The Supreme Court opined that sufficient evidence "includes, at a minimum, documentation of the services performed, who performed them and at what hourly rate, when they were performed, and how much time the work required" with sufficient detail that the court can make a meaningful review the reasonableness of the fee request. *Id.* at 764. Because the testimony in *El Apple* only included the total number of hours worked and generalities about discovery and the length of trial, the Supreme Court determined the evidence in that case was insufficient to support an award of attorney's fees and it remanded the case to the trial court for a redetermination of those fees. *Id.* at 765. Likewise, in *City of Laredo v. Montano,* the Supreme Court reversed and remanded the case to the trial court in order to redetermine attorney's fees when the attorney testified to the time expended and the hourly rate but failed to provide evidence of the time devoted to specific tasks. *City of Laredo v. Montano*, 414 S.W.3d 731, 736-37 (Tex. 2013).

*El Apple* involved a claim under the Texas Commission on Human Rights Act which mandated use of the Lodestar method in such cases. *El Apple,* 370 S.W.3d at 760. *See also* TEX. CIV. PRAC. & REM. CODE ANN. § 26.003(a) (providing that "the trial court shall use the Lodestar method to calculate the amount of attorney's fees to be awarded class counsel"). The Supreme Court has, however, held that the *El Apple* requirements also apply to an attorney's fee request under section 38.001 of the Texas

Civil Practice and Remedies Code if the party applying for the award "uses the [L]odestar method by relating the hours worked for each of the . . . attorneys multiplied by their hourly rates for a total fee." *Long v. Griffin*, 442 S.W.3d 253, 255 (Tex. 2014); *Auz v. Cisneros*, 477 S.W.3d 355, 362-63 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (same conclusion).

Therefore, in a case such as this, where a party seeks to establish the reasonableness of a request for attorney's fees under the Lodestar method, and the evidence is factually insufficient to support the amount of attorney's fees awarded because the evidence presented does not provide sufficient information for a meaningful review of the Lodestar calculation, an appellate court is required to reverse the judgment as to the issue of attorney's fees and remand the matter to the trial court for a redetermination of those fees consistent with the opinion of the court. Accordingly, issue four is sustained.

CONCLUSION

We affirm the trial court's judgment regarding liability as to Leins's contract cause of action and as to the award of $9,000 in actual damages; however, we reverse the trial court's judgment awarding recovery of $100,000 in future damages and we render a take-nothing judgment as to that claim; and we reverse the trial court's judgment as to the recovery of attorney's fees totaling $144,000 and remand this matter to the trial court for a redetermination of attorney's fees consistent with the opinion of this court.

Patrick A. Pirtle
Justice