**Opinion issued August 8, 2019**



In The

# Court of Appeals

### For The

# First District of Texas

————————————

### NO. 01-17-00830-CV

————————————

## CHARLIE THOMAS CHEVROLET, LTD D/B/A CHAMPION CHEVROLET GULF FREEWAY, Appellant

### V.

### GENARO MARTINEZ, Appellee

**On Appeal from the 164th District Court**
**Harris County, Texas**
**Trial Court Case No. 2012-27666**

## O P I N I O N

Genaro Martinez sued Charlie Thomas Chevrolet, LTD d/b/a Champion Chevrolet Gulf Freeway for instigation of false imprisonment and for violations of the Deceptive Trade Practices Act (DTPA). Martinez had acquired a new pickup truck from Champion Chevrolet and a few weeks later was briefly detained by police

when paperwork mistakes by Champion Chevrolet led it to believe that Martinez's truck had been stolen from Champion Chevrolet.

At trial, a jury found Champion Chevrolet liable for instigation of false imprisonment and for DTPA violations and awarded Martinez $25,500 in actual damages, $75,000 in additional damages, and $21,900 for attorney's fees through trial, along with conditional attorney's fees on appeal. The jury also found Martinez to have been negligent and 15% responsible. Martinez elected to recover on his DTPA claim, and the trial court entered judgment for Martinez on his damages (reduced by 15%) and for attorney's fees.

Asserting one issue with numerous sub-issues, Champion Chevrolet argues that the judgment on the DTPA claims must be reversed and that judgment should not have been rendered for instigation of false imprisonment. We reverse the judgment and render judgment that Martinez take nothing on his DTPA claims. We remand the case to the trial court for consideration of the jury's alternative finding that Champion Chevrolet instigated the false imprisonment of Martinez.

**Background**

In November 2011, Martinez went to Champion Chevrolet, a former Houston auto dealership, to buy a new truck. He dealt with salesman Lupe Garcia. They attempted to complete deals on two used trucks, but Martinez had poor credit and could not obtain financing on either of them. Seeking a solution, Garcia suggested

that Martinez find a co-signer, so Martinez left and later returned with his co-worker Andrew Cisneros, who was to be his co-signer.

Martinez test drove both a new black and a new white Chevrolet Silverado truck and selected the black one. Garcia then completed the Retail Purchase Agreement for the sale of the black Silverado, but to get around Martinez's poor credit, the agreement was made between Champion Chevrolet and Cisneros, rather than with Martinez. Garcia was aware, however, that Martinez would be using the truck following its purchase by Cisneros.

In filling out the Retail Purchase Agreement, Garcia made a critical error. Although Martinez had selected the black Silverado, Garcia erroneously filled in the Vehicle Identification Number (VIN) for the white Silverado that Martinez had also test-driven. Garcia also erroneously indicated in the agreement that the white Silverado was being purchased, rather than the black one. This error resulted in Champion Chevrolet's records reflecting that the white Silverado had been sold and was no longer in the dealership's inventory and that the black Silverado Martinez had driven off the lot was still in the inventory. Martinez was given a copy of the Retail Purchase Agreement signed by Cisneros but did not notice that it erroneously referenced the white Silverado.

A couple of weeks after the sale, Champion Chevrolet performed its monthly inventory reconciliation. During that process, it discovered that the black Silverado

3

was not on the lot and became concerned that it was missing and possibly stolen. After learning that the black Silverado was missing, General Sales Manager Tania Eubanks asked an employee to look for it on the lot. After that search was unsuccessful, Eubanks obtained the "key report" for the black Silverado, and it showed that the salesman Garcia was the last person in possession of the black Silverado's keys.

After Champion Chevrolet management learned that Garcia had shown the black Silverado to Martinez, Garcia was asked to call Martinez to make sure that he was not in the incorrect vehicle. Garcia was asked to have Martinez read to him the VIN off the body of the vehicle and to make sure the Retail Purchase Agreement was for the correct vehicle.

Garcia first called Cisneros, who unsurprisingly did not have the black Silverado, and then Martinez. Garcia told Martinez that the dealership was missing a vehicle. He then asked Martinez to go outside and read to him the VIN off the body of the truck. Martinez replied that it was dark outside and instead read to Garcia the VIN on his copy of the Retail Purchase Agreement, which was of course identical to the VIN on Garcia's copy. Because the VIN read by Martinez matched the VIN on Garcia's copy of the Retail Purchase Agreement, the VIN mix-up was not discovered. This conversation reinforced the dealership's belief that Martinez did not have the black Silverado.

4

Martinez disputed Garcia's version of that phone call. He testified that Garcia called him one night and told him that he needed the VIN on the truck. Martinez told him that he had the paperwork, that it was cold and he was not going outside at that time, and that he read to Garcia the VIN off of the paperwork. Martinez then asked Garcia if everything was all right, and Garcia told him not to worry about it and to enjoy his truck. Champion Chevrolet did not go to Martinez's residence to inspect the VIN, ask Martinez to bring his truck to the dealership for inspection, or even ask him what color his truck was.

Champion Chevrolet continued its efforts to locate the missing black Silverado, searching its body shop and "make ready" area. Finally, it called Onstar, which the vehicle was equipped with, and requested that Onstar locate the truck electronically.[1] Onstar would not activate its location system unless the police were notified that the truck had been stolen, so Champion Chevrolet called the police and reported the black Silverado as stolen.

Houston Police Department records reflect that Champion Chevrolet called to report that the black Silverado was stolen. Under the report section entitled "Details of Offense," the report states: "Complainant's vehicle was stolen. Complainant will

---

[1]     According to Champion Chevrolet, Onstar provides subscription-based communications, in-vehicle security, emergency services, hands-free calling, turn-by-turn navigation, and remote diagnostics for vehicles.

prosecute. No suspect. No arrest." The report did not mention Martinez at all, including as a suspect.

In response to the report, Officer G. Olvera was dispatched. Officer Olvera testified that the call to the police "dropped as a tracked vehicle," which meant that someone (in this case Onstar) was tracking it. He was in the area and went to the location that Onstar had electronically fixed for the truck and had provided to police. That location was the apartment complex where Martinez lived. By that time, Onstar had remotely deactivated the truck. Officer Olvera parked and watched the truck, and when its headlights came on, he called for backup, approached the truck, and found Martinez with it.

Officer Olvera testified that, before the event, no one from Champion Chevrolet had told him that Martinez was a thief or had stolen the truck and that Champion Chevrolet never requested that he target or arrest Martinez. Officer Olvera did not know that Martinez was going to be there when he arrived at the address where the truck had been located.

Officer Olvera testified that the police announced themselves to Martinez and, as part of normal police procedure, handcuffed him and told him that he was being detained for questioning because they were tracking a possibly stolen vehicle. Officer Olvera could not remember if he or any other officer drew their weapons

when they approached Martinez, but he said that if they did, it would have been proper police procedure for the investigation of a stolen vehicle.

Martinez testified that shortly before he was detained by the police, he had gotten into his truck to pick up some food for his family for dinner, but his truck would not start—unknown to him, it had been disabled by Onstar. Martinez called Champion Chevrolet because he thought there was something wrong with his truck, and he was told to get his other key and try to start it again. Martinez went back into his home to get his other key, and when he returned to the truck to attempt to start it again, police were there. There was a "gun behind" his back and he heard "Put your hands up in the air." Martinez complied, and he was handcuffed.

Martinez testified that he was handcuffed and detained from forty-five minutes to an hour while police investigated. Officer Olvera testified that Martinez was detained during the investigation for possibly as long as an hour.

After being detained, Martinez showed Officer Olvera his truck keys, and they unsuccessfully attempted to start the truck. Martinez's wife came outside with the paperwork for the truck, and the police looked it over and then called Champion Chevrolet. The dealership, after hearing the information reported by the police, realized that the truck had, in fact, been purchased but that the VIN in the paperwork had been mixed up and so informed the police. While he was in handcuffs, the police handed Martinez the phone to talk to the salesman Garcia about the error, and

7

according to Martinez, Garcia laughed about it. At that point, the police released Martinez. Martinez was not arrested or taken to jail, and he was not charged with a crime.

Champion Chevrolet's General Manager Eubanks was present when the police called the dealership. Her reaction was that a terrible mistake had been made. The police were told that a mistake had been made and that the wrong VIN was on Martinez's paperwork. The dealership called a tow truck to bring the deactivated Silverado to the dealership for reactivation, and Martinez rode in the tow truck. The dealership apologized to him, and the sales documents were redone to reflect the correct vehicle and VIN. Martinez testified that dealership employees laughed at him when he got there, but Garcia denied that he or any other employee laughed at Martinez.

Martinez sued Champion Chevrolet, asserting as causes of action negligence, negligent misrepresentation, false imprisonment, conversion, trespass to chattels, fraud, DTPA violations, malicious prosecution, and breach of contract. The trial court granted summary judgment on the breach of contract claim, and at trial, Martinez abandoned his claims of malicious prosecution, fraud, negligent misrepresentation, conversion, and trespass to chattels. Also at trial, Martinez acknowledged that Champion Chevrolet had not "falsely imprisoned" him but proceeded on the theory that it was liable for "instigation of false imprisonment."

After both sides rested, the trial court granted Champion Chevrolet's motion for directed verdict on Martinez's negligence and gross negligence claims but denied the motion as to the claims for instigation of false imprisonment and for DTPA violations. The jury made the following findings on those claims:

1.  Champion Chevrolet instigated the false imprisonment of Martinez.

2.  Martinez's negligence was a proximate cause of the occasion in question.

3.  In the sale of the truck to Cisneros, Champion Chevrolet violated the DTPA either by representing that goods are of a particular style or model if they are another or by representing that an agreement confers or involves rights that it did not have or involve, and the violation was a producing cause of Martinez's damages.

4.  In reporting the truck as stolen, Champion Chevrolet violated the DTPA either by representing that goods are of a particular style or model if they are another or by representing that an agreement confers or involves rights that it did not have or involve, and the violation was a producing cause of Martinez's damages.

5.  In the sale of the truck to Cisneros, Champion Chevrolet engaged in an unconscionable action or course of action that was a producing cause of Martinez's damages.

6.  In reporting the truck as stolen, Champion Chevrolet did *not* engage in an unconscionable action or course of action that was a producing cause of Martinez's damages.

7.  In the sale of the truck to Cisneros and in reporting the truck as stolen, Champion Chevrolet engaged in the conduct intentionally and knowingly.

8.  Martinez's percentage of responsibility was 15% and Champion Chevrolet's percentage was 85%.

9

9. Martinez was awarded $25,000 for mental anguish in the past, $500 for loss of use of the truck, and nothing for mental anguish in the future.

10. Martinez was awarded $75,000 in additional damages for Champion Chevrolet's intentional DTPA violations.

Martinez elected to recover under the DTPA because it provided a greater recovery. After denying Champion Chevrolet's motion to disregard jury answers and to enter judgment notwithstanding the verdict (JNOV), the trial court signed a final judgment in Martinez's favor on his DTPA claims. Champion Chevrolet's motion for new trial was overruled by operation of law, and this appeal followed.

**Analysis**

Champion Chevrolet asserts that the trial court erred in entering judgment for Martinez on his DTPA claims because: (1) the DTPA claims are an impermissible attempt to recast his instigation-of-false-imprisonment allegations as an unintentional tort; (2) Champion Chevrolet did not commit a DTPA violation; (3) the allegedly actionable conduct was not a producing cause of harm to Martinez; (4) Martinez presented no evidence of economic damages; (5) there was no knowing or intentional conduct to support an award of mental anguish or enhanced damages; and (6) there was no evidence of mental anguish sufficient to support an award of damages for mental anguish.

Champion Chevrolet also asserts that the trial court erred in entering judgment for Martinez on his instigation-of-false-imprisonment claim because: (1)

10

Champion Chevrolet did not instigate Martinez's detention by the police; (2) Martinez elected to recover on his DTPA claims; (3) the trial court failed to define "instigation" or instruct the jury on it; and (4) Champion Chevrolet's actions were privileged and justified.

The elements of a claim for false imprisonment are: (1) willful detention; (2) without consent; and (3) without authority of law. *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002). A party can be liable for instigation of false imprisonment if the plaintiff proves that the party "clearly directed or requested" the arrest or detention of the plaintiff. *Id.* at 507; *see Davis v. Prosperity Bank*, 383 S.W.3d 795, 799–800 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

The intentional tort of false imprisonment, like the related intentional tort of malicious prosecution, has stringent standards for recovery. *See Rodriguez*, 92 S.W.3d at 510 (declining "to hold that negligently providing inaccurate or incomplete information to legal authorities will make a reporting party liable for false imprisonment"); *Wal-Mart Stores, Inc. v. Medina*, 814 S.W.2d 71, 73 (Tex. App.—Corpus Christi 1991, writ denied). The policy behind such stringent standards is to avoid discouraging the reporting of crimes. *See Smith v. Sneed*, 938 S.W.2d 181, 184–85 (Tex. App.—Austin 1997, no writ); *Medina*, 814 S.W.2d at 73–74; *see also Rodriguez*, 92 S.W.3d at 510 ("All citizens have a clear legal right to

11

report criminal misconduct to law enforcement authorities. In fact, the law encourages such communication.").

"There is no guarantee in our society that only guilty persons will be accused and arrested." *Smith*, 938 S.W.2d at 184 (citing *Baker v. McCollan*, 443 U.S. 137, 145 (1979)). The balance "between protecting against wrongful prosecution and encouraging the reporting of crime," *Smith*, 938 S.W.2d at 184, is "heavily weighed against the wrongly accused." *Medina*, 814 S.W.2d at 73. These policies may result in "something less than natural justice." *Smith*, 938 S.W.2d at 184–85 (quoting *Louis v. Blalock*, 543 S.W.2d 715, 719 (Tex. Civ. App.—Amarillo 1976, writ ref'd n.r.e.)); *Medina*, 814 S.W.2d at 73 (same). In those cases where the wrongly accused or arrested plaintiff cannot meet the stringent standards for recovery, the plaintiff's damages are *damnum absque injuria*.[2] *Medina*, 814 S.W.2d at 74.

A plaintiff cannot circumvent the stringent standards for recovery of the intentional torts of false imprisonment and malicious prosecution by pleading other claims based on the same facts. *See, e.g.*, *Delese v. Albertson's, Inc.*, 83 S.W.3d 827, 830 (Tex. App.—Texarkana 2002, no pet.); *ITT Consumer Fin. Corp. v. Tovar*, 932 S.W.2d 147, 155–56 (Tex. App.—El Paso 1996, writ denied); *Kale v. Palmer*, 791 S.W.2d 628, 631–32 (Tex. App.—Beaumont 1990, writ denied); *see also Smith*, 938

---

[2] *Damnum absque injuria* and *damnum sine injuria*, BLACK'S LAW DICTIONARY 449–50 (9th ed. 2009) ("Damage without wrongful act.").

S.W.2d at 185 ("To hold, as Smith would have us do, that Sneed's negligence is actionable would in substance convert the tort of malicious prosecution to one of negligent prosecution."). The true nature of a cause of action depends on the facts alleged in the petition, the rights asserted, and the relief sought, not on the descriptive terms or labels used. *Delese*, 83 S.W.3d at 830; *Kale*, 791 S.W.2d at 631.

In *McClung v. Wal-Mart*, a federal case that we find persuasive, the plaintiff bought a telephone and handset extension cord at a Wal-Mart, and because the cashier did not remove the magnetic security chip attached to the phone, the store's security alarm was activated when the plaintiff left the store. 866 F. Supp. 306, 308 (N.D. Tex. 1994). Wal-Mart employees stopped the plaintiff in the parking lot and asked him to return to the store, but the parties disagreed on the amount of force that was used to return the plaintiff to the store. *Id.* The plaintiff asserted common law liability theories, but he also attempted to allege that Wal-Mart violated the DTPA when its employees allegedly assaulted and falsely arrested him:

> Plaintiff attempts to invoke the DTPA's remedies by stating that he was sold a defective telephone, one with the inventory control device still attached. As a result of this defect, he was assaulted by the Defendant.
> . . . .
>
> Plaintiff also alleges that Wal-Mart failed to provide him with numerous services its advertising promised, or the services it provided were defective. First, Plaintiff states that the service of removing or deactivating the inventory control chips was inadequate, or of insufficient quality or expertise, and defective. Second, Plaintiff asserts that Wal-Mart "advertises and promises a superior overall shopping transaction—a superior shopping experience" that it failed to provide

13

because he was assaulted by a Wal-Mart employee and the manager lied to him about rectifying the situation. Third, Plaintiff asserts that "Wal-Mart *expressly* promises satisfaction with every transaction and a superior level of friendliness" (emphasis in original) which it failed to provide. In regard to this element, Plaintiff asserts that his shopping experience was "such a variance that it is an unconscionable violation of the DTPA." Fourth and finally, the Plaintiff asserts that Wal-Mart failed to provide a quick and fair resolution of his problem to his satisfaction as the company promises.

*Id.* at 308–09 (footnotes omitted).

Wal-Mart argued that the DTPA was not the proper vehicle for the plaintiff's common law claims and that the DTPA claims in the plaintiff's complaint failed to state a cause of action for which relief could be granted. *Id.* at 308. The federal court agreed, first finding that the plaintiff's claims arose out of post-transaction conduct wholly unrelated to the quality or suitability of the phone he had purchased: "[W]hat the Plaintiff complains of was incidental to, rather than in connection with, his purchase of a telephone and cord from Wal-Mart." *Id.* at 309. The court next held that the plaintiff did not assert a claim that Wal-Mart had committed an unconscionable action or course of action under the DTPA:[3] "In short, this remedy is aimed at economic results, not whether the Plaintiff had his arm twisted in the

---

[3] The DTPA defines "[u]nconscionable action or course of action" as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." TEX. BUS. & COM. CODE § 17.45(5).

parking lot. . . . Unconscionable is defined in the statute and is limited to economic outcomes associated with commercial transactions." *Id.* at 310–11.

This court has similarly held that a security guard's guided escort of a customer out of a department store after she had violated a directive not to shop there and not to return merchandise there was not unconscionable under the DTPA as a matter of law and that the trial court properly granted a directed verdict. *Scruggs v. Franke*, No. 01-96-00794-CV, 1998 WL 224022, at *7 (Tex. App.—Houston [1st Dist.] May 7, 1998, no pet.) (not designated for publication) (citing *McClung*, 866 F. Supp. at 310).

Champion Chevrolet's principal sub-issue on Martinez's DTPA claims is that the trial court erred in denying its motion to disregard and for JNOV on the ground that Martinez had improperly recast his instigation-of-false-imprisonment claim as DTPA claims.

A motion for JNOV should be granted when a legal principle precludes recovery. *Peterson Grp., Inc. v. PLTQ Lotus Grp., L.P.*, 417 S.W.3d 46, 77 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). "A trial court may disregard a jury's findings and grant a motion for JNOV only when a directed verdict would have been proper." *Id.* at 76. A motion for directed verdict should be granted when (1) a defect in the opponent's pleading makes it insufficient to support a judgment, (2) the evidence conclusively proves facts establishing the movant's right to judgment, or

15

negates the nonmovant's right to judgment, as a matter of law, or (3) the evidence is legally insufficient to raise a fact issue on a proposition necessary to entitle the nonmovant to judgment. *Neller v. Kirschke*, 922 S.W.2d 182, 187 (Tex. App.—Houston [1st Dist.] 1995, writ denied).

> A denial of a motion for directed verdict may be reversed where the evidence conclusively proves a fact that establishes a party's right to judgment as a matter of law and there is no evidence to the contrary. *McCarley v. Hopkins*, 687 S.W.2d 510, 512 (Tex. App.—Houston [1st Dist.] 1985, no writ). In reviewing the denial of an instructed verdict, we consider all the evidence in the light most favorable to the nonmovant and disregard all evidence to the contrary. *Harris County v. Demny*, 886 S.W.2d 330, 333 (Tex. App.—Houston [1st Dist.] 1994, writ denied). Every reasonable inference is resolved in favor of the nonmovant. *Id.*

*Cliffs Drilling Co. v. Burrows*, 930 S.W.2d 709, 712 (Tex. App.—Houston [1st Dist.] 1996, no writ).

The "true nature" of Martinez's cause of action is his complaint about the post-transaction stolen-vehicle report and his detention by the police. *See McClung*, 866 F. Supp. at 308 ("this [detention] is the conduct giving rise to Plaintiff's claims"); *id.* at 309 ("Plaintiff's claims arise out of post-transaction conduct wholly unrelated to the quality or suitability of the goods he purchased."); *Scruggs*, 1998 WL 224022, at *6 ("Scruggs's complaints really concern her treatment on the day in question after being refused to make returns and after being told to leave. These events, while unpleasant to Scruggs, had nothing to do with *taking advantage of her*

*lack of knowledge, ability, experience, or capacity* to a grossly unfair degree in some type of consumer or economic transaction.").

Like the Wal-Mart cashier in *McClung* who mistakenly failed to remove the magnetic security chip attached to the phone purchased by the plaintiff, Champion Chevrolet mistakenly put the incorrect VIN on the paperwork for the truck purchased by Martinez through Cisneros. Martinez's claims arose out of post-transaction conduct—the report of the truck as stolen and the police detention—that is wholly unrelated to either the quality or suitability of the truck that he purchased through Cisneros or to any representations by Champion Chevrolet to Martinez about the Retail Purchase Agreement.[4] And the VIN mistake in the paperwork was not an

---

[4]    Regarding the two DTPA "laundry list" violations found by the jury, Champion Chevrolet notes that there is no evidence that it represented to Martinez that the truck was of a particular style or model when it was of another. *See* TEX. BUS. & COM. CODE § 17.46(b)(7); *cf. Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 305 & n.15 (Tex. 2006) (car dealership promised plaintiff she would receive premium-model vehicle but delivered base-model vehicle). Champion Chevrolet sold to Martinez, through Cisneros, the black Silverado that Martinez wanted to buy. There is no evidence that the black Silverado was not the particular style or model that Champion Chevrolet represented it to be, and the paperwork error had nothing to do with the particular style or model of the black Silverado.

Champion Chevrolet further notes that there is no evidence that it made a representation to Martinez that the Retail Purchase Agreement conferred or involved rights that it did not have or involve. *See* TEX. BUS. & COM. CODE § 17.46(b)(12); *cf. Bossier Chrysler-Dodge II, Inc. v. Riley*, 221 S.W.3d 749, 753 (Tex. App.—Waco 2007, pet. denied) (car dealership misrepresented buyer's right to cancel installment contract). For liability under section 17.46(b)(12), the defendant must have made an affirmative misrepresentation to the plaintiff about or outside the agreement. *See Ken Petroleum Corp. v. Questor Drilling Corp.*, 24 S.W.3d 344, 357 (Tex. 2000) (citing *Best v. Ryan Auto Grp., Inc.*, 786 S.W.2d 670,

17

unconscionable act that took advantage of Martinez to a grossly unfair degree in the sale of the truck to him through Cisneros. *See* TEX. BUS. & COM. CODE § 17.45(5); *McClung*, 866 F. Supp. at 310–11; *see also Scruggs*, 1998 WL 224022, at *6.

Champion Chevrolet is correct that this case is only an instigation-of-false-imprisonment case. *See Delese*, 83 S.W.3d at 830 (concluding that true nature of plaintiff's fraud and conspiracy claims was malicious prosecution); *Tovar*, 932 S.W.2d at 155–56 (holding that plaintiff could not avoid strict elements of malicious prosecution action by labeling it negligence); *Kale*, 791 S.W.2d at 631–32 (concluding that true nature of plaintiffs' fraud and conspiracy to defraud claims was malicious prosecution). Accordingly, the trial court erred in denying Champion Chevrolet's motion to disregard and for JNOV, which asserted this complaint. The trial court should have found for Champion Chevrolet as a matter of law on Martinez's DTPA claims on this basis and should have rendered judgment that Martinez take nothing on his DTPA claims. We sustain Champion Chevrolet's sub-issue that Martinez improperly recast his instigation-of-false-imprisonment claim as

---

671–72 (Tex. 1990) (holding that evidence of representations outside contract was legally sufficient evidence to support section 17.46(b)(12) claim)); *Wyly v. Integrity Ins. Sols.*, 502 S.W.3d 901, 907–08 (Tex. App.—Houston [14th Dist.] 2016, no pet.). There is no evidence that Champion Chevrolet made any representations to him about the Retail Purchase Agreement, including any representations to him about the VIN in the agreement.

DTPA claims. Because we sustain this sub-issue, we need not address Champion Chevrolet's other sub-issues on Martinez's DTPA claims.

Having determined that Martinez take nothing on his DTPA claims, we turn to Champion Chevrolet's sub-issues on the jury's finding that it instigated the false imprisonment of Martinez. We first address Champion Chevrolet's sub-issue that complains that the trial court entered judgment on both Martinez's DTPA claims and on his instigation-of-false-imprisonment claim. We disagree. While the judgment incorporated the jury finding on instigation of false imprisonment, *see Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.*, 747 S.W.2d 785, 786–87 (Tex. 1988), Martinez elected recovery on his DTPA claims and the judgment awarded him damages on only his DTPA claims. No double recovery was awarded. We therefore overrule this sub-issue.

In electing recovery on his DTPA claims, Martinez did not waive his alternative claim for instigation of false imprisonment. When "a party tries a case on alternative theories of recovery and a jury returns favorable findings on two or more theories, the party has a right to a judgment on the theory entitling him to the greatest or most favorable relief." *Boyce Iron Works*, 747 S.W.2d at 787; *see, e.g.*, *Landing Cmty. Improvement Ass'n, Inc. v. Young*, No. 01-15-00816-CV, 2018 WL 2305540, at *24 & n.11 (Tex. App.—Houston [1st Dist.] May 22, 2018, pet. filed) (mem. op.); *Strebel v. Wimberly*, 371 S.W.3d 267, 286 (Tex. App.—Houston [1st Dist.] 2012,

pet. denied). If the judgment is reversed on appeal, the party may seek recovery under the alternative theory on remand. *Boyce Iron Works*, 747 S.W.2d at 787; *Landing Cmty. Improvement Ass'n*, 2018 WL 2305540, at *24 & n.11; *Strebel*, 371 S.W.3d at 286. Because Martinez may be entitled to seek judgment on his alternative instigation-of-false-imprisonment claim, we remand this case to the trial court for consideration of the jury's alternative finding. *See Landing Cmty. Improvement Ass'n*, 2018 WL 2305540, at *24 & n.11.

## Conclusion

We reverse the trial court's judgment and render judgment that Martinez take nothing against Champion Chevrolet on his DTPA claim. We remand the case to the trial court for consideration of the jury's alternative finding that Champion Chevrolet instigated the false imprisonment of Martinez.


Richard Hightower
Justice

Panel consists of Justices Lloyd, Kelly, and Hightower.